Emily Joy JACKSON, Plaintiff,

v.

**FIRST FEDERAL SAVINGS OF ARKANSAS, F.A., et al.,**
Defendants.

Nos. LR–C–86–560, LR–C–87–792
and LR–C–87–793.

United States District Court,
E.D. Arkansas, W.D.

Nov. 15, 1988.

See also 709 F.Supp. 887.

Gene Mesh, Cincinnati, Ohio, H. William Allen, Allen, Cabe & Lester, Little Rock, Ark., of counsel, Stanley R. Wolfe, Jeanne A. Markey, Berger & Montague, Philadelphia, Pa., for plaintiff.

Richard J. Osterman, Jr., Trial Atty., Fed. Home Loan Bank Bd., Office of Gen. Counsel, Washington, D.C., for FHLB.

John M. Skrhak, & Douglas E. Yeager, Berman, Fichtner & Mitchell, Dallas, Tex., John E. Pruniski, III, Phil Campbell, Hilburn, Bethune, Calhoon, Harper & Pruniski, Ltd., North Little Rock, Ark., for defendants.

Philip E. Kaplan, Kaplan, Brewer & Miller, Little Rock, Ark., for H. Charles Johnson.

Robert S. Lindsey, Wright, Lindsey & Jennings, Little Rock, Ark., for Smith Barney, Harris Upham & Co. & Prudential–Bache Securities.

Stephen Engstrom, Wilson Law Firm, Little Rock, Ark., & Charles Lee Eisen, Kirkpatrick & Lockhart, Washington, D.C., for Kaplan, Smith & Associates.

## ORDER

EISELE, Chief Judge.

Plaintiffs allege that defendants engaged in a scheme to sell stock in a financially

troubled savings and loan. First Federal, the corporate defendant, is the savings and loan. The Individual Defendants are various officers and directors of First Federal. Defendants have moved to dismiss two of the Complaints in these consolidated actions, namely the Hagerty (LR–C–87–792) and Gitlin (LR–C–87–793) cases. They make a variety of arguments which, taken together, challenge all of the Counts in the two Complaints.

## I. SUMMARY OF REGULATORY PROVISIONS

Savings and loans such as First Federal are insured and regulated by the Federal Savings and Loan Insurance Corporation (the "Corporation"), which is in turn under the direction of the Federal Home Loan Bank Board (the "Board"). 12 U.S.C. 1725. The issues raised in this case must be resolved in the context of the regulatory regime applicable to savings and loans. One cannot understand what is alleged to have happened in this lawsuit without an understanding of certain basic aspects of that regime.

A savings and loan may have either of two forms of organization. Under the mutual form, the account holders (i.e., depositors) are the "owners," with each account holder's share of the institution proportional to the size of his or her account. Under the stock form, ownership is divided into shares of stock and the shares are sold to stockholders, who may or may not also be depositors in the savings and loan.

From time to time, mutual form savings and loan associations decide to convert to the stock form. Generally, "no insured institution may convert from the mutual to the stock form except in accordance with the rules and regulations of the Corporation." 12 U.S.C. 1725(j)(1). See 12 C.F.R. 563b.1(a) ("the provisions of this part shall exclusively govern the conversion of mutual insured institutions ... to capital stock insured institutions"). Of particular concern to the Board in promulgating the conversion regulations was avoiding the undesireable economic effects of " 'windfall' distributions to the account holders of a con-

verting mutual insured institution." 12 C.F.R. 563b.3(a) (1980) ("Findings of Federal Home Loan Bank Board"). Consequently, "[t]he regulations contained in this part, while providing the account holder with rights to a share in the equity of the converting mutual insured institution in the event of a subsequent complete liquidation, are designed virtually to eliminate the 'windfall' aspect of conversion and the resulting disruptive effect on the economy." Id.

The regulations attempt to eliminate windfall distributions through two means. First, the price of the shares offered to the account holders is to be objectively set, based upon the market value of the savings and loan. Second, the ability of the account holders to buy shares other than on the open market is restricted.

As to objective pricing, "the converting insured institution shall issue and sell its capital stock at a total price equal to the estimated pro forma market value of such stock in the converted insured institution, based on an independent valuation, as provided in 563b.7." 563b.3(c)(1). The 563b.7 valuation is to be done by "persons independent of the applicant, experienced and expert in the area of corporate appraisal, and acceptable to the Corporation." 563b.7(f)(1)(i). "[T]he sales price of the shares of capital stock to be sold in the conversion shall be a uniform price determined in accordance with 563.b.7 ..." 563b.3(10).

Account holder ability to acquire newly issued shares is subject to a fairly complex system of restrictions intended to give account holders an opportunity to acquire an equity interest, without allowing them to obtain a windfall. These restrictions may be summarized as follows. Account holders are given "without payment, nontransferable subscription rights to purchase capital stock" up to an amount calculated according to the regulation. 563b.3(c)(2). Special limits are placed on the subscription rights of officers, directors and their associates, and supplemental subscription rights and other subscription rights are created for certain categories of persons.

563b.3(c)(3)–(5). "[A]ny shares of the converting insured institution not sold in the subscription offering shall either be sold in a public offering through an Underwriter or directly by the converting institution in a direct community marketing," subject to Corporation approval and regulation. 563b.3(c)(6).

The Corporation exercises supervision over the conversion process similar to that exercised by the Securities Exchange Commission ("SEC") over the issuance of new stock. Pertinently here, 563b.3(h) provides that

> *Manipulative and deceptive devices.* In the offer, sale or purchase of securities issued incident to its conversion, no insured institution, or any director, officer, attorney agent or employee thereof, shall: (1) Employ any device, scheme, or artifice to defraud, or (2) obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) engage in any act, transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser or seller.

This section tracks exactly the substantive language of SEC rule 10b–5, 17 C.F.R. 240.10b–5.

Once the savings and loan's board of directors has voted to convert, specified steps must be taken to complete an appropriate application and to inform members of the proposed plan of conversion. 563b.4. The decision to convert must be approved by the institution's members. The Corporation regulates proxy solicitation and the voting process pursuant to 563b.5 and 6.

The actual sale of securities must be "by means of a final offering circular which has been declared effective by the Corporation." 563b.7(a)(3). Each order form through which stock is purchased "shall be accompanied or preceded by the final offering circular for the subscription offering or the public offering, as the case may be, and a set of detailed instructions explaining how to properly complete such order forms." 563b.7(g)(2).

While the Corporation reviews the price information in the offering circular before declaring the circular effective, it does not inquire into the accuracy of that information: "No representations may be made in any manner that such price information has been approved by the Corporation or that the shares of capital stock sold pursuant to the plan of conversion have been approved or disapproved by the [Board] or the Corporation or that the Board or Corporation has passed upon the accuracy or adequacy of any offering circular covering such shares." 563b.7(d).

For the purposes of this decision, there are three key facts to be kept in mind concerning this regulatory scheme. (1) The offering price is set by an independent appraiser based on the market value of the institution. (2) Sales are (a) to account holders through the subscription offering, (b) to members of the community through a community offering, or (c) to members of the public through an underwriter and public offering. (3) In each case, the sale must be by means of a final offering circular which states the price at which the stock may be ordered. Having laid that groundwork, we may now turn to plaintiffs' allegations.

## II. PLAINTIFFS' CLAIMS

Plaintiffs [1] allege that First Federal was converted from a mutual to a stock savings and loan in March of 1986. Plaintiffs have sued First Federal and various named officers and directors (the "Individual Defendants") for fraud in connection with that

---

**1.** There are a goodly number of named plaintiffs, and a request for class certification. Not all of the plaintiffs assert claims under all of the statutes and regulations invoked, but the asserted grounds for dismissal for failure to state a claim may be applied generically. In other words, it is not necessary at this time to identify precisely which plaintiffs assert what claims. Neither is it yet necessary to delineate the alleged roles of each defendant.

conversion.[2]

Taken together, the various named plaintiffs bought stock pursuant to the offering methods discussed above: subscription and community offering, and public offering. Proxy materials were used in connection with obtaining depositor approval of the conversion plan. A Subscription and Community Offering Circular and a Public Offering Circular were issued and utilized in connection with the offerings. Some of the plaintiffs also purchased stock on the open market.

The gravamen of these actions is that the proxy statements and offering circulars failed to disclose material facts concerning problem real estate loans and other difficulties. It is asserted that such failure to disclose permitted First Federal to offer and sell stock which otherwise could not have been issued to the public or which would have been issued to the public at a dramatically lower price. First Federal's financial problems have now become known, and those who bought the stock have taken a bath. The stock sold during the offerings at $10 per share is now worth much less, and may actually be essentially worthless.

Plaintiffs assert a panoply of security law claims: section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b); Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5; section 20 of the Exchange Act, 15 U.S.C. 78t; the Home Owner's Loan Act of 1933, 12 U.S.C. 1461, et seq., and the rules and regulations promulgated thereunder, and the Arkansas Securities Act, Ark.Code Ann. 23–42–101, et seq. By means of an Amended Complaint, one of the named plaintiffs also asserts a claim under section 12(2) of the Securities Act of 1933, 15 U.S.C. 77*l* (2).

### III. DISMISSAL STANDARD

For purposes of these dismissal motions, all the well-pled averments in plaintiffs' Complaints are taken as true. Plaintiffs' Complaints should not be dismissed for fail-

ure to state a claim unless it appears beyond a doubt that the plaintiffs can prove no set of facts in support of their claims which would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

### IV. DEFENDANTS' GROUNDS FOR DISMISSAL

Defendants urge five grounds for dismissal of various of plaintiffs claims; all the claims are covered by at least one of these. Those grounds are: (1) Plaintiffs do not allege reliance on any misrepresentations or omissions supposedly made by defendants, nor have they properly alleged any of the surrogates which may take the place of reliance in a securities fraud action. (2) Plaintiffs do not plead fraud with the particularity required by Fed.R.Civ.P. 9(b). (3) The attempt of certain plaintiffs to plead a claim based on alleged misrepresentations contained in the proxy materials is outside this Court's jurisdiction because it involves matters related to the Board's approval of the conversion. As to the 12(2) claim, (4) plaintiffs do not allege the required privity between plaintiffs and defendants and (5) by exempting federally chartered banks from its strictures and not affording the same exemption to federally chartered savings and loans, section 12(2) violates the equal protection component of the Fifth Amendment's Due Process Clause.

### A. LACK OF RELIANCE

■ In a securities fraud case, as in fraud cases generally, it is ordinarily essential for a plaintiff to show reliance on the fraudulent statements or omissions of the defendant. A securities fraud cause of action includes as an element causation, which is usually demonstrated by showing the materiality of the statement and the reliance of the plaintiff upon it. *See, e.g., Harris v. Union Electric Co.*, 787 F.2d 355, 362 (8th Cir.1986) cert. denied, 479 U.S. 823, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986) (elements of a 10b–5 claim include "causa-

**2.** Both sides have used the Hagerty Complaint as their point of reference in connection with the Motions to Dismiss. The Court will also

follow that convention, unless otherwise indicated.

tion, often analyzed in terms of materiality and reliance"). The reason for the reliance requirement is obvious: the plaintiff seeks to recover for the injury defendant's statements have done to that plaintiff. If the plaintiff has taken no action in reliance on a particular statement, then the truth or completeness of that statement is of no consequence to the plaintiff.

Plaintiffs in these actions do not allege that they directly relied on any statement by any of the defendants (including any statements or omissions in the proxy materials or the offering circulars) in purchasing First Federal stock. Instead, plaintiffs contend that they are entitled to a presumption of reliance under either of two theories: (1) this is a case involving primarily defendants' failure to state material facts and (2) the "fraud on the market" theory is applicable in this case. These contentions will be taken in that order.

### 1. Omissions

■ The courts have recognized an exception to the reliance requirement in cases where the plaintiff alleges that the defendant omitted to disclose material facts, rather than that the defendant affirmatively misrepresented material facts. This exception is justified on the grounds that it will ordinarily be impossible for a plaintiff to prove that he relied on the absence of disclosure. It was adopted by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972):

> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.

The Court has explained that in *Affiliated Ute,* "we ... dispensed with a requirement of positive proof of reliance, where a duty to disclose material information had been breached, concluding that the necessary nexus between the plaintiffs' injury and the defendant's wrongful conduct had been established." *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988).

The plaintiff need only prove materiality of the omitted fact to receive the benefit of the presumption. "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding" whether to purchase stock. *TSC Industries v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." Id. (*TSC* was a proxy solicitation case, but the definition of materiality there adopted has been applied equally to stock purchases. *Basic Inc.,* 108 S.Ct., at 983 (10(b) and 10b–5); *Austin v. Loftsgaarden,* 675 F.2d 168, 176 n. 17 (8th Cir.1982) (all securities laws).)

Defendants do not now deny that the omissions plaintiffs allege are material. Instead, they claim that plaintiffs primarily allege misrepresentations rather than omissions. This distinction is made crucial by the applicable Eight Circuit precedent. Of the several Eighth Circuit cases discussing the *Affiliated Ute* presumption, two frame the issue in this case and also form the foundations for the parties' respective claims. These are *Vervaecke v. Chiles, Heider & Co.,* 578 F.2d 713 (8th Cir.1978) and *Harris v. Union Electric Co.,* 787 F.2d 355 (8th Cir.1986).

Defendants' argument rests almost entirely on their reading of *Vervaecke,* in which the Court refused to give the plaintiff the benefit of the *Affiliated Ute* presumption because it found that plaintiff's "chief complaint concerned alleged material misrepresentations, and omissions in the nature of misrepresentations, in two specific documents, the 1973 and 1976 offering statements which accompanied the respective bond offerings." 578 F.2d, at 717. "Omissions in the nature of misrepresentations," the Court explained, include "misleading statements" and "half-truths." 578 F.2d, at 717 n. 2.

*Vervaecke* is, apparently, still the Eighth Circuit's basic exposition of the circumstances under which *Affiliated Ute* does and does not apply, so it will bear close study. On the other hand, its discussion of the key points is terse to the point of obscurity, and understanding the Court's analysis depends, at least partially, on careful attention to its use of italics. *Vervaecke* affirms a summary judgment based principally on the complaint, and more particularly on the following portion of the complaint, which the Court set forth at 578 F.2d, at 717–18, with its own added emphasis:

13. The Defendants, singularly and in concert, by act and omission, *prepared, reviewed, tolerated and distributed Offering Statements to Plaintiff* and to those individuals who originally purchased such Bonds, *which contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made not misleading,* which operated as a fraud and deceit on each purchaser in the manner and form set forth below:

(a) The untrue *statements of material facts* contained in the Offering Statement included the following:

\* \* \* \* \* \*

(b) The material facts which the Defendant omitted to state which were *necessary in order to make the statements made,* in the light of the circumstances under which they were made, *not misleading,* included the following:

\* \* \* \* \* \*

Based on the italicized language, the Court concluded that "[t]hough other theories of this case might have been devised, we find that the thrust of what [plaintiff] actually pleaded was the use of fraudulent misstatement and omission within the four corners of an offering prospectus which mislead *him* and the other bond purchasers." 578 F.2d, at 718 (emphasis in original). "We conclude that this is not a nondisclosure case, and will not compare the facts here with the facts in *Affiliated Ute*

or with that case's frame of reference." 578 F.2d, at 718 n. 4.

Defendants would read *Vervaecke* so as to prevent application of *Affiliated Ute* whenever the alleged omissions were from a written document, or to mean that whenever *something* has been said about a subject, any omissions to state other facts about the subject would be deemed misrepresentations. These readings find little support in logic, and not much in *Vervaecke* itself. Rather, what the Court in *Vervaecke* appears to have said is that the plaintiff there was mainly complaining about affirmative misrepresentations, and that whatever omissions were included in his complaint were omissions to make statements which would have exposed the affirmative misrepresentations as being untrue. Thus, if we add a clarifying word, the key language from the complaint was construed by the Court to mean that the Offering Statement included "untrue statements of material facts" and that the Offering Statement omitted to state facts which were "necessary in order to make the [untrue] statements made ... not misleading."

Defendants themselves provide the key to the *Vervaecke* puzzle when they observe that "[c]ertainly, every misrepresentation contains an omission in failing to state those facts which would have prevented the statement from being considered a misrepresentation." What the decision means is that if the only omissions alleged are failures to state facts which would have prevented the affirmative misrepresentation from being considered a misrepresentation, then the omissions are in the nature of, or are part and parcel of, the misrepresentation.

The opinion itself may not be crystal clear on this point, but cases from other courts have so read it. That reading is also the only one consistent with *Harris,* 787 F.2d 355.

The few opinions from outside the Circuit which have explained *Vervaecke* have all construed it thus. In *Lipton v. Documation, Inc.,* 734 F.2d 740, 743 (11th Cir. 1984), cert. denied 469 U.S. 1132, 105 S.Ct.

814, 83 L.Ed.2d 807 (1985), the Court understood *Vervaecke* to stand for the proposition that there is "no presumption of reliance where new issues are involved and *claims are based on affirmative misrepresentations.*" (Emphasis added.) Similarly, the Court in *Grossman v. Waste Management, Inc.*, 589 F.Supp. 395, 409 (N.D.Ill. 1984) summarized *Vervaecke* as holding that "[s]ince the *Affiliated Ute* presumption of reliance exists primarily because of the practical impossibility of proving reliance where no statements are made, its underlying rationale does not logically apply *in a case in which the "omissions" are the type that can be said to exist only because of other, positive statements the company has made.*" (Emphasis added.) *Accord, Rowe v. Maremont Corp.*, 650 F.Supp. 1091, 1105 (N.D.Ill.1986), aff'd 850 F.2d 1226 (7th Cir.1988).

Courts within the Eighth Circuit are generally in accord. The allegations and circumstances in *In re McDonnell Douglas Corp. Securities Litigation*, 587 F.Supp. 625, 626–27 (E.D.Mo.1983) were closely analogous to those in this case. The Court concluded that "plaintiff's allegations and deposition testimony, as well as the relevant documents, indicate that the claims primarily focus on defendants' alleged failure to disclose material information. Thus, the *Ute* exception of reliance applies here." 587 F.Supp., at 628.

In *Dekro v. Stern Brothers*, 540 F.Supp. 406 (W.D.Mo.1982), the Court rejected defendant's claim that "the presence in the offering circulars of some references" to a problem project made the case one of misrepresentation. "It would defeat the flexible, remedial purposes of the federal securities laws to deny the plaintiffs the use of the *Affiliated Ute* presumption when they allege wholly inadequate disclosure of information concerning" the project. 540 F.Supp., at 411 n. 3. *Vervaecke* was distinguished, among other grounds, on the basis that "Vervaecke had pleaded a typical 10b–5 case of misrepresentation, even though other theories of the case might have been devised; ... Plaintiff here has pleaded an *omissions* theory, and this court will not convert it into a case of

misrepresentation, just as the *Vervaecke* court would not convert a misrepresentation theory into one of omission." 540 F.Supp., at 412. (Emphasis in original.) *But see Gilbert v. Woods Marketing, Inc.*, 454 F.Supp. 745, 749 (D.Minn.1978) ("Each of them charges defendants with making implications contrary to fact or statements conveying deceptive half-truths. None of the allegations involves a complete failure to refer to a particular material fact.... the plaintiffs complain of misstatements and failures to convey complete pictures. Consequently, each plaintiff will be obliged at trial to establish his or her reliance on the alleged misrepresentations.")

The final indication that this Court's interpretation of *Vervaecke* is correct will be found in the Eighth Circuit's own decision in *Harris*, 787 F.2d 355, which plainly cannot be reconciled with defendants' proposed reading of *Vervaecke*. In *Harris*, defendant issued bonds, then called those bonds prior to maturity. The call resulted in a sharp drop in the value of the bonds and plaintiffs, some of the bond-purchasers, sued. They claimed among other things that "the prospectus for the ... Bonds misrepresented and omitted material facts regarding the call-protection provisions of the bond contract." 787 F.2d, at 360. In affirming a verdict in plaintiffs' favor, the Court reviewed the prospectus and concluded that it

is ambiguous and misleading in that it omits material facts concerning the call protection.... The prospectus is misleading in that it does not adequately disclose the authorization [for lower cost refunding at special redemption prices], while giving the impression that refunding the bonds at a lower rate of interest before March 1, 1985 is prohibited.... [A specified provision] renders the premium price list [in the prospectus] meaningless and misleading, since it represents prices that would never be paid. Finally, the prospectus is misleading in that it fails to disclose [defendant's] right to directly call the bonds.... The jury could reasonably have found that the prospectus is misleading and ambiguous

in that it omits material facts that would have adequately disclosed the call protection of the bonds.

787 F.2d, at 364–65.

After a further review of the evidence, the Court reiterated that "the plaintiffs produced sufficient evidence for the jury to have found that the prospectus is ambiguous and misleading in that it omitted material facts that would have adequately disclosed [defendant's] right to call the bonds, in violation of Rule 10b–5(b)." 787 F.2d, at 365–66. On the question of causation, the Court concluded that "[b]ecause the plaintiffs' complaint consists primarily of allegations of a failure to adequately disclose the call-protection rights, reliance in this case can be inferred from materiality." 787 F.2d, at 367.[3]

*See also Barnes v. Resource Royalties, Inc.*, 795 F.2d 1359 (8th Cir.1986), where, as the district court explained, "[p]laintiff contend[ed] that defendants misrepresented and omitted certain material facts concerning the exercise of plaintiff's option and subsequent purchase of Resource Royalties shares. Primarily plaintiff argue[d] that defendants misrepresented themselves as the seller whereas [a third party] was the actual seller, that defendants failed to disclose that the monies paid for the shares were never invested in Resource Royalties, and the defendants failed to disclose that [one of the defendants] had been a respondent in administrative hearings in 1972 in Missouri and Oklahoma." 610 F.Supp. 499, 504 (E.D.Mo.1985). The Court of Appeals reversed a judgment for the defendant based on non-reliance, finding that plaintiff "correctly argues that because his section 10(b) cause of action involves primarily a failure to disclose, he was not required to show reliance." 795 F.2d, at 1367. "Because the district court found that the omissions were material, [plaintiff] is entitled to a presumption of reliance." Id.

With the relevant law in mind, it is now time to turn to plaintiffs' allegations in order to ascertain whether they assert primarily affirmative misrepresentations (including half-truths and misstatements), or omissions so as to give rise to the *Affiliated Ute* presumption of causation. There is no substitute for examining the precise language of the Complaint in order to determine what it is that plaintiffs complain of. *See* Defendants' Brief in Support, at 9–10 (reviewing Complaint paragraphs 42–51); Plaintiffs' Memorandum in Opposition, at 31–4 (same).

The key paragraphs may be summarized as follows:

42. The offering circulars disclosed that during a recent Board examination of First Federal, the examiner expressed serious concerns regarding certain loan underwriting and lending policies and procedures of First Federal, but the offering circulars and proxy statement did not disclose additional listed material facts about those concerns and about the questioned policies and procedures.

43. The offering circular disclosed that First Federal's ratio of Scheduled Items to specific assets exceeded the limits of 2.5% set by the Board, but the offering circulars and the proxy statement did not disclose additional listed material facts about that ratio and the regulatory consequences of that ratio.

44. The offering circulars and proxy statement failed to disclose a problem in First Federal's loan to value ratio in a large percentage of its commercial real

---

**3.** Defendants cite *Bastien v. R. Rowland & Co.*, 631 F.Supp. 1554, 1560 (E.D.Mo.1986), aff'd mem., 815 F.2d 713 (8th Cir.1987), for the proposition that under *Vervaecke* "the *Affiliated Ute* rule does not extend to cases in which omissions are alleged in a document, [because] in such a case there is no need to presume reliance." *Harris*, which was handed down only very shortly before *Bastien* was decided, makes the district court's broad language untenable. The *Bastien* court also held that "all of plaintiffs' claims are barred by the statute of limitations."

631 F.Supp., at 1560. Given the plain inconsistency between the district court's ruling on the reliance issue and the holding in *Harris*, it seems likely that the Court of Appeals' affirmance without opinion was based on limitations, if not on its concurrence in the district court's conclusion that the entire lawsuit had been a burdensome abuse of the process, *see* 631 F.Supp., at 1561. *See also Austin*, 675 F.2d, at 177–78 (by implication finding that omissions from offering circular could be the basis for a nondisclosure case).

estate loans because many properties were overvalued.

45. The offering circulars and the proxy statement failed to disclose that First Federal's reserves were inadequate to cover expected losses.

46. Defendants wrongfully failed to disclose that First Federal's earnings would deteriorate as a result of loan rewriting and modification procedures then contemplated and in process.

47. Defendants wrongfully failed to disclose that First Federal's ratio of Scheduled Items to total assets was experiencing devastating deterioration which would accelerate in the future.

48. Defendants wrongfully failed to disclose that First Federal's loan delinquency rates would continue to escalate dramatically, and such disclosures as were made failed to evidence the full extent of the delinquencies.

49. Defendants wrongfully failed to disclose that although First Federal's controls and operating procedures were changed as a result of the Board's investigation in 1985, the lack of proper controls in the period preceding the investigation had caused defendants to extend commercial real estate loans in amounts which materially impaired the reported value of First Federal's loan receivables, which impairment was neither corrected nor disclosed by the reported prospective alterations in controls.

50. The offering circulars and the proxy statement failed and omitted to adequately disclose the effect of the fact that the Board required First Federal to change its estimates of the useful life of the excess of cost over fair value of net assets acquired in business combinations.

51. In the offering circulars, First Federal stated that based upon regulatory accounting principles, it had a regulatory net worth as of September 30, 1985, of $86.6 million, or approximately $40.3 million in excess of that required by the Board, but the offering circulars failed to disclose that the Board had placed limitations on the purposes for which certain of its assets could be counted towards net worth.

52. The enumerated failures to disclose are a result of a scheme to defraud.

On their face, these allegations all refer to failures to disclose material facts. Defendants' response is to label plaintiffs' formulations "word games" because, defendants say, what is really complained of is the insufficiency or inadequacy of what was disclosed, not the complete failure to disclose. Defendants' Brief in Support, at 9–10; Defendants' Reply, at 9–11. *Vervaecke* and, most directly, *Harris* provide the answer to defendants' arguments. In *Vervaecke*, as we have already seen, the Court apparently felt that the basic thrust of plaintiff's claim was that defendants had made untrue statements, and that the alleged omissions were merely ancillary to the misrepresentations. 578 F.2d, at 717–18. In contrast, in *Harris*, the defendant had issued a prospectus which was "ambiguous and misleading in that it omit[ted] material facts concerning the call protection." 787 F.2d, at 364. In other words, in *Harris* it was not what was said that was fraudulent, but what was not said, or what was not said adequately.

Plaintiffs' claims are more nearly akin to those in *Harris* than to those in *Vervaecke*. Plaintiffs do not allege that there were untrue statements in the offering circulars, so it cannot be contended that the thrust of the lawsuit is directed to affirmative fraudulent misrepresentations. To take an example, according to paragraph 42 the offering circulars say that the Board's examiner had expressed serious concerns about First Federal's loan underwriting and lending policies and procedures. Plaintiffs do not allege that this statement is untrue, or that it is misleading. Rather, they say that the statement is true, and provide a list of related facts which are, for purposes of this motion, deemed material and which were not disclosed.

Nevertheless, defendants argue that what plaintiffs are asserting in paragraph 42 is, "[i]n other words, allegations of misrepresentations." Elsewhere, as to different paragraphs of the Complaint, defendants say that "[a]n inadequate disclosure

is most certainly not a nondisclosure." It is apparently defendants' position that if the offering circular says anything at all about a subject, then any incompleteness of disclosure must be deemed a misrepresentation rather than a nondisclosure. That argument is foreclosed by *Harris*, where the prospectus did say something about call protection, but did not say enough.

Defendants assert that *Harris* is "readily distinguishable" from this case.[4] First, they claim that in that case "there was a complete failure to disclose the defendant's right to recall the bonds within ten (10) years after their issuance." Defendants' Reply, at 9. The already quoted language from *Harris* establishes that this proposed distinction is entirely without merit, as does a review of the excerpts from the prospectus set forth at 787 F.2d, at 362–63.[5] Defendants' second proposed distinction, that in *Harris* the plaintiffs were not contending that the prospectus misrepresented the condition of the defendant company, whereas that is the clear thrust of plaintiffs' Complaints in this case, is even less to the point. It is true that in one case the fact omitted was the nature of the call protection, and in the other case it is the financial condition of the company. This no doubt constitutes a difference between the cases, as does the fact that the defendant in one case was a utility and in the other is a savings and loan. Defendants do not suggest any relevance to these differences, and none occurs to the Court. The

dispositive fact is that plaintiffs' claims in both cases rest principally on alleged failures to disclose material facts.

To conclude as to the *Affiliated Ute* presumption, taking only the allegations in the Complaint as the basis for decision, the Court holds that plaintiffs allege primarily a case of nondisclosure of material facts. As they have pleaded their case, plaintiffs are entitled to invoke a presumption that they relied on the material omissions asserted. Whether defendants will be able to rebut that presumption, as well as other questions under this head, will await another day.

### 2. Fraud-on-the-Market

■ As an alternative basis for presuming reliance, plaintiffs turn to the fraud-on-the-market theory. This theory was recently accepted as valid under the proper set of facts by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). *Basic Inc.* provides sufficient legal framework for the purposes of ruling on these dismissal motions so that, with certain exceptions, it is not necessary to examine the many cases and voluminous body of scholarly works developing and explaining the notion of fraud on the market as a substitute for actual reliance.[6]

"Succinctly put,

The fraud on the market theory is based on the hypothesis that, in an open and

---

4. This ready distinguishability is something of an afterthought. Despite their extensive review of securities cases, in both official and unofficial reporters, and also despite their citation of *Harris* on other points, Defendants' Brief in Support, at 12, defendants did not find, or omitted to cite, this most recent and most obviously pertinent decision from the Eighth Circuit in connection with this issue.

5. Specifically, the prospectus said that "the Company may not redeem any of the New Bonds (other than through the Improvement Fund or by the application of certain moneys in the Maintenance Fund or otherwise in the trust estate) from or in anticipation of funds borrowed having an interest cost to the Company of less than 10.60% per annum." What the company did was borrow money at a lower rate through the Maintenance Fund, 787 F.2d, at 360, thereby calling the bonds in a manner

expressly identified but not fully explained in the prospectus. Thus, there was not a "complete failure to disclose" the right to call the bonds. There was instead, as the Court of Appeals quite clearly stated, an inadequate and an "ambiguous and misleading" disclosure of that right.

6. Defendants call the 4–2 majority in *Basic Inc.* a "plurality," apparently suggesting that the opinion has less than binding effect on this Court. Defendants are incorrect. As the dissent in *Basic Inc.* recognizes, the four Justice majority was for the Court. While it may be that a majority opinion concurred in by less than an absolute majority of the Court is more likely to be later overruled, that empirical fact has no bearing on the precedential value of the decision. *See Manning v. Palmer*, 381 F.Supp. 713, 715, 715–16 n. 1 (D.Ariz.1974).

developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."

*Basic Inc.*, 108 S.Ct., at 989–90, *quoting Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3d Cir.1986).

As the Court observed, the driving reason for use of the fraud-on-the-market theory is that it is otherwise difficult to certify a class of defrauded stock purchasers (or sellers). "Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented [plaintiffs] from proceeding with a class action, since individual issues then would have overwhelmed the common ones." Id., 108 S.Ct., at 989. While acknowledging that "reliance is an element of a Rule 10b–5 cause of action" because "[r]eliance provides the requisite causal connection between a defendant's misrepresentations and a plaintiff's injuries," the Court warned that "[t]here is, however, more than one way to demonstrate the causal connection." Id.

An additional factor considered by the Court is that "[t]he modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by the early fraud cases." Id., at 989–90. The consequences of this shift to an impersonal market were explained as follows:

In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.

Id., 108 S.Ct., at 990, *quoting In re LTV Securities Litigation*, 88 F.R.D. 134, 143 (N.D.Tex.1980).

These facts weighed in favor of some modification of the traditional reliance requirement, at least in some instances. The particular modification adopted by the courts below in *Basic Inc.* was a presumption of reliance on the market price. These courts "accepted a presumption, created by the fraud-on-the-market theory and subject to rebuttal by [defendants], that persons who had traded Basic shares had done so in reliance on the integrity of the price set by the market, but because of [defendants'] material misrepresentations that price had been fraudulently depressed." Id., 108 S.Ct., at 990. This presumption was consistent with "considerations of fairness, public policy, and probability, as well as judicial economy." Id. It was consistent with the underlying purposes of Rule 10b–5 litigation. Id., 108 S.Ct., at 990–91. Furthermore, "[t]he presumption is also supported by common sense and probability. Recent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." Id., 108 S.Ct., at 991. In short, "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." Id., 108 S.Ct., at 991–92.

It is important to bear in mind that the presumption created by the fraud-on-the-market theory is rebuttable. "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." Id., 108 S.Ct., at 992.

Defendants advance a three pronged attack on plaintiffs' efforts to rely on the

fraud-on-the-market theory here: (1) the presumption should not be allowed in cases of newly issued securities; (2) the presumption should not be allowed in cases arising under Rule 10b–5(b), and plaintiffs do not adequately allege claims under Rules 10b–5(a) or (c); and (3) the presumption should not be allowed because the securities were not worthless when issued.

### (a) Newly Issued Securities

■ Defendants first argue that the fraud on the market theory is inapplicable because the First Federal stock purchased was, at least as to some purchases by some plaintiffs, a new issue. Consequently, as to these purchases, there was no established market for the stock and there could be no reliance on the general integrity of the market price. In fact, defendants argue, the initial offering price is not set by the market at all, but is instead set by an independent appraiser pursuant to the 563b.7 appraisal mechanism discussed earlier in this Order.[7]

This argument may perhaps be characterized as half-hearted. The most that defendants say is that "some commentators have criticized the extension of the fraud on the market theory to cases involving newly issued securities" and that the Eighth Circuit has not expressly recognized its applicability in those circumstances. Defendants would perhaps concede that the real point they are making is that when there is no open and developed market for a security, as there would not be in the case of a new issue, then it makes no sense to talk of the market setting the price of a stock.

The conclusion defendants wish to draw from this fact, that fraud on the market may never be used to create a presumption of reliance in the case of new issues, is answered by a case defendants themselves cite: "[t]here are arguably several fraud on the market theories, or at least several different categories of cases in which it may apply." *Nelson v. Craig–Hallum, Inc.*, 659 F.Supp. 480, 483 n. 2 (D.Minn. 1987). These categories include at least (1) manipulation of actively traded stock, sometimes called fraud on the open market, (2) fraudulent proxy statements designed to create an unfair exchange ratio in a forced merger situation and (3) newly issued stocks, sometimes called fraud on an undeveloped market. Id. Because there is no developed market for a new issue, it is true that the fraud on the market theory must be applied in a different way; this does not mean that it cannot be applied at all.[8] *See Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981) (en banc), cert. denied, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983). (The requisites for application of the fraud on the market theory to newly issued securities are discussed more fully below.)

### (b) Not Rule 10b–5(b)

■ Defendants next argue that fraud on the market cannot be used to show causation in a new-issue case brought under Rule 10b–5(b), but only under Rules 10b–5(a) and (c). Furthermore, defendants contend, plaintiffs have not sufficiently alleged violations of Rules 10b–5(a) and (c), so they may not rely on the fraud on the market theory at all.

It should be noted that some of the plaintiffs claim that they bought stock on the open market, after the public offering. As to those purchases, 10b–5(b) would be applicable and plaintiffs could rely on the presumption arising from the fraud-on-the-market theory. *Basic Inc.*, 108 S.Ct., at 983 n. 6.

Turning to the merits of the issue, the Court begins with the observation of the

---

**7.** Defendants' argument concerning the independent appraisal and certain remarks of the plaintiffs (*See* Plaintiffs' Memorandum in Opposition, at 25–7) suggest that this case might be analyzed under the "indirect causation" theory developed in *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981), vacated as moot, 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982), and other cases. *See, Grossman,* 589 F.Supp., at 406 n. 4.

**8.** *Basic* adopted the fraud on the open market theory, while *Shores* is based on fraud on an undeveloped market, so this Court is not bound as to the latter theory. However, the weight of authority favors the *Shores* version, and the Court finds it logically analogous. As the *Basic* Court noted, the issue is how a plaintiff may show causation, not whether one theory or another is acceptable.

Third Circuit Court of Appeals that defendants' argument "suffers from the difficulty of trying to pigeonhole a particular rule 10b–5 action into only one of the three paragraphs in rule 10b–5." *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 189 n. 19 (3d Cir.1981), cert. denied 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). However, defendants are correct, and plaintiffs implicitly concede, that the fraud-on-the-market theory may only be applied to new issues under Rules 10b–5(a) and (c), not under Rule 10b–5(b).

The principle case is *Shores*, 647 F.2d 462, where the Court explained that, essentially for reasons already discussed, a plaintiff may not assert that misrepresentations and omissions (Rule 10b–5(b)) affected the market price of the stock when there is as yet no market. However, the Court continued, a plaintiff could rely on fraud-on-the-market to support a claim alleging a fraudulent marketing scheme under Rules 10b–5(a) and (c). Such a claim would reach a scheme "so pervasive that without it the issuer would not have issued, the dealer would not have dealt in, and the buyer could not have bought [the securities] because they would not have been offered on the market at any price." Id., 647 F.2d, at 464 n. 2. Plaintiff's "burden of proof will be to show that (1) the defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers, (2) *[plaintiff] reasonably relied on the [securities'] availability on the market as an indication of their apparent genuineness,* and (3) as a result of the scheme to defraud, he suffered a loss." 647 F.2d, at 469–70 (emphasis added).

Simply looking at the averments, which is all that a court should do in resolving a motion to dismiss, and giving the plaintiff the benefit of every reasonable inference, which is the appropriate state of mind, this Court cannot comfortably say that the Complaint alleges *only* the omission to state material facts in violation of Rule 10b–5(b). The averments can reasonably be read to also allege that defendants employed a device, scheme or artifice to defraud (Rule 10b–5(a)) and that defendants engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person (Rule 10b–5(c)).

What plaintiffs say is that the defendants converted a financially troubled savings and loan, what plaintiffs call a "sick" bank, to the stock form of ownership. In so doing, it is alleged, the defendants concealed the financial problems so as to be able to sell stock which would otherwise have been unmarketable. Under plaintiffs' theory, the entire stock offering was a fraud, and the whole process by which the conversion was accomplished was a calculated effort to raise money to keep the savings and loan afloat. "Rather than containing the entire fraud, [the fraudulent proxy materials and offering circulars were] assertedly only ... step[s] in the course of an elaborate scheme." *Shores,* 647 F.2d, at 468. The proxy materials were supposedly intended to persuade the account holders to approve the conversion and the offering circulars to persuade people to buy the stock.[9] Of course, the court has no idea whether plaintiffs can prove any of this, but it is what they have alleged, and they should at least be given the opportunity.[10]

Defendants are correct when they note that mere conclusory allegations of a fraudulent scheme do not adequately plead

**9.** This raises the specter of defendants' argument that the plan of conversion is exclusively within the jurisdiction of the Board, and that this Court may not engage in collateral review of the Board's decision. But, as indicated below in the discussion of that argument, the scope of the Board's jurisdiction should be limited to the subjects over which it exercises authority. The Board does not look behind the papers filed with it, and its approval of a plan of conversion does not represent a finding that the plan is not a scheme to defraud. Consequently, to allow the Board's approval to immunize such a scheme would turn a regulatory system intended to protect the public into a wall behind which fraud may be practiced with impunity.

**10.** The question of whether plaintiffs have met the Fed.R.Civ.P. 9(b) requirement that fraud be pleaded with particularity is a separate issue, and is addressed below.

a claim, and if the particular paragraphs on which defendants focus were all that plaintiffs said about these issues, plaintiffs would probably not have complied with Fed.R.Civ.P. 8, much less Rule 9(b). But the summary paragraphs to which defendants point [*Gitlin* Complaint, paragraph 45; *Hagerty* Complaint, paragraphs 52, 57] merely state legal conclusions which plaintiffs believe can be drawn from the substantive averments in earlier paragraphs. The Court is persuaded that those other paragraphs, particularly when read in the tolerant light of a motion to dismiss, do allege "a comprehensive scheme beyond the making of the alleged misrepresentations and omissions." Defendants' Brief in Support, at 20.

### (c) Stock was not worthless

■ As their final argument on this head, defendants contend that "[i]n cases involving newly issued securities, courts 'have required a showing that the fraud resulted in the marketing of a wholly worthless security.'" Though defendants put the crucial language in quotation marks, they do not identify the source of the quotation, nor do they identify any court which has required "a showing that the fraud resulted in the marketing of a wholly worthless security." What the courts have required the plaintiff to show, as indicated in the excerpts from *Shores* already quoted, is that the securities "would not have been offered on the market at any price." This, for example, is the thrust of the discussion of *Shores* in *Lipton*, 734 F.2d, at 743–47 ("it is reasonable to allow recovery on the fraud on the market theory where the securities could not have been marketed but for the fraud").

There is a difference between a security which is "worthless" and a security which is "unmarketable." [11] Defendants would limit the scope of the fraud on the market theory in new issue cases to instances where the buyers bought a share of nothing, to sale-of-the-Brooklyn-Bridge cases. There is no warrant in precedent or logic

for that result. For example, in *Shores* the bondholders received back about one-third of their investment upon liquidation of the company for whose benefit the bonds were sold. Clearly, the bonds were not "worthless." However, if the allegations in *Shores* are true, it seems quite likely that the bonds were unmarketable at any price absent fraudulent concealment of the true state of the company.

Securities may be unmarketable because they are too speculative, or because the prospects of the company look too dim. The securities might nevertheless have some worth, but that is not the question. To return once again to *Shores*, the company there might, despite all the objective indications, have turned out to be a slam-bang manufacturer of mobile homes. If that had been the case, securities issued in the company would have turned out to have substantial value. But the securities would likely have also been unmarketable when issued if all the relevant facts were disclosed, because it is unlikely that any investors would have been willing to take the chance. Similarly, in the case now before the Court, the savings and loan may have positive net worth, so that there would be some break-up value for stockholders, but yet its shares might have been unmarketable when issued had the alleged omitted facts been known because investors would not have taken the risk if they had known the true financial conditions. The shares would be unmarketable, though not worthless. *See Ross v. Bank South, N.A.,* 837 F.2d 980, 1001–02 (11th Cir.1988) (bonds could be unmarketable even though all bondholders recovered their entire investment plus a small amount of interest).

Once again, the Court must conclude that plaintiffs have alleged enough to entitle them to go forward.

### B. RULE 9(b)

■ The Individual Defendants allege that plaintiffs do not plead the circumstances constituting fraud with particularity, as

---

11. One, somewhat mechanical, way of demonstrating this distinction is to look at the language of *Shores*, which talks about securities which would not have been marketed "at any price." This language emphasizes that it is not price that is crucial, but something else, something which may be referred to as "marketability."

required by Fed.R.Civ.P. 9(b). This rule is a qualification of the ordinary Fed.R.Civ.P. 8(a) requirement that a plaintiff need only make a short and plain statement of the claim showing that the plaintiff is entitled to relief, and there is obvious tension between the two rules. On the one hand, defendants should not be subjected to unsubstantiated or baseless charges of fraudulent conduct, nor should they be required to respond to accusations so vague that defendants cannot meaningfully answer them. On the other hand, wrongdoers should not be allowed to hide behind walls of secrecy and those injured should not be stopped at the threshold because they know only the general outlines, and not the hidden details, of schemes and conspiracies. The task of the court in ruling on a 9(b) motion is to balance those two competing interests. *See generally*, Form 13, Fed.R. Civ.P.; 5 Wright and Miller, sections 1297–98; Note, *Pleading Securities Fraud with Particularity Under Rule 9(b)*, 97 Harv.L. Rev. 1432 (1984).

As a preliminary matter, it should be noted that Rule 9(b) allows "[m]alice, intent, knowledge, and other condition of mind" to be averred generally. Consequently, the focus of an inquiry under Rule 9(b) is the sufficiency of the factual allegations which are supposed to show the fraud.

Wright and Miller provide the following overview of the Rule's requirement:

> The sufficiency of a particular pleading under Rule 9(b) depends upon a number of variables. For example, the degree of detail required often turns on the context in which the fraud is alleged to have occurred.... The sufficiency of a fraud pleading also varies with the complexity of the transaction in question. When the issues are complicated or the transactions cover a long period of time, courts tend to require less of the pleader.... Perhaps the most basic consideration in making a judgment as to the sufficiency of a pleading is the determination of how much detail is necessary to give adequate notice to an adverse party and enable him to prepare a responsive pleading.

5 Wright and Miller, sec. 1298, at 410–415.

Particularly relevant in this case are those decisions which recognize that a plaintiff may not be able to plead the precise role of each defendant when a group of defendants has acted in concert to cause the complained of injury. Under those circumstances, it is appropriate to plead the actions of the group and leave development of individual liability questions until some discovery has been undertaken, rather than to dismiss the plaintiff because he does not have what may be concealed information. Typical of these decisions is *Haroco v. American National Bank and Trust Co. of Chicago*, 747 F.2d 384, 405 (7th Cir. 1984), aff'd 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), a RICO case:

> the complaint adequately specified the transactions, the content of the allegedly false representations, and the identities of those involved. In addition, the identification of the transactions and the description of the alleged scheme to defraud put the defendants on fair notice of the time and place of the false representations.

*See also, e.g., Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439–40 (9th Cir.1987); *Fondren v. Schmidt*, 626 F.Supp. 892, 898 (D.Nev.1986); *Banowitz v. State Exchange Bank*, 600 F.Supp. 1466, 1469 (N.D.Ill. 1985); *Somerville v. Major Exploration, Inc.*, 576 F.Supp. 902, 910–11 (S.D.N.Y. 1983); *Pridgen v. Farmer*, 567 F.Supp. 1457, 1459 (E.D.N.C.1983); *Merrit v. Libby, McNeill & Libby*, 510 F.Supp. 366, 373–74 (S.D.N.Y.1981); *Pellman v. Cinerama, Inc.*, 503 F.Supp. 107, 111 (S.D.N.Y.1980); *Denny v. Carey*, 72 F.R.D. 574, 579 (E.D. Pa.1976); *B & B Investment Club v. Kleinert's, Inc.*, 391 F.Supp. 720, 727 (E.D.Pa. 1975); *Burkhart v. Allson Realty Trust*, 363 F.Supp. 1286, 1289 (N.D.Ill.1973).[12]

12. In the face of this authority, and more cases could be cited on the point, it is simply not enough for defendants to assert that the rule is otherwise in this Circuit, particularly when their authority consists entirely of a general remark in a case which did not consider this issue at all. Defendants present no reason to presume that the Eighth Circuit has set itself apart from the

Defendants rely on *Bennett v. Berg,* 685 F.2d 1053, 1062 (8th Cir.1982), cert. denied, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983), for the proposition that " '[c]ircumstances' include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." [13] As a general statement of a general rule, which is all the Court intended when the statement was made, this is beyond dispute. However, it does not constitute the whole universe of possible Rule 9(b) authority, nor does it set forth a make-or-break criterion for evaluating a fraud complaint in light of the Rule.

Applying the *Berg* test, it is apparent plaintiffs allege that the defendants collectively decided to defraud the stock-buying public by selling shares in an ailing savings and loan, while concealing crucial facts which, if known, would have made the stock unmarketable. Plaintiffs have alleged the facts which evidence the fraudulent scheme for which they seek to recover, they have alleged with specificity such details as time, place and contents of false representations, and they have, within the context of the presumptions the law entitles them to plead, stated what was obtained or given up thereby.

Defendants apparently contend that plaintiffs do not adequately allege "the identity of the person making the representation," but it is doubtful that that requirement can be meaningfully applied to this case. Plaintiffs' allegations are that the Individual Defendants, who are the persons in charge of the savings and loan, made a decision to market stock by means of concealment of the facts set forth in the Complaint. Short of pleading detailed evidence which is, in any event, almost certainly not available to plaintiffs at this time, it is hard to see what more plaintiffs can plead.

Defendants' claim that they cannot respond to the allegations rings somewhat hollow. They are alleged to have held certain positions with the savings and loan; they must know whether they did or did not. Given those positions, they were presumably familiar with the decision to convert the savings and loan, which must be among the most important events which can occur in the life of such an institution. Plaintiffs allege that each of the defendants approved that conversion, and each defendant should know whether that averment is true as to himself. The Individual Defendants should also have some idea whether most of the substantive factual allegations set forth in detail in the Complaint are true, and if they do not know, they can plead lack of knowledge. Fed.R. Civ.P. 8(b). Each of them either had something to do with the proxy materials and offering circulars alleged to contain the fraudulent omissions, or he did not. (These documents were adequately enough identified that defendants attached them to their motion to dismiss, so there is not the problem with knowing what statements are referred to that the Court found in *Berg,* 685 F.2d, at 1062.) If each Individual Defendant was involved with the materials, he either believes that the omissions were made, or he does not, and he can plead accordingly. (If he does not have any knowledge, he can plead that.)

Most importantly, each of the Individual Defendants can respond on his own behalf to the claim that he participated in the collective scheme plaintiffs allege. Given the detail of plaintiffs' averments, it is not unreasonable to expect each Individual Defendant to deny those allegations which he contends are either not true at all or are

---

rest of the Circuits in its construction of this Rule. It is worth noting that a number of the cited opinions are from the Southern District of New York, the Court (in the Circuit) which, for obvious reasons, has been most concerned with deterring strike suits in securities cases.

**13.** Defendants assert "[i]t has been specifically held in this Circuit that the 'circumstances' which must be plead [sic] with particularity include such matters as the time, place," etc., citing *Berg.* But the case does not say that all of these things must be pled in every case. It instead gives a listing of the sorts of things which are, to use the language of the treatise which the Court in *Berg* was summarizing, "generally" called for. *See* 2A *Moore's Federal Practice,* para. 9.03.

not true as applied to that particular Individual Defendant.

To summarize the Court's holding on the Rule 9(b) claim, plaintiffs have sufficiently apprised the Individual Defendants of the collective scheme defendants are alleged to have launched. There may have been no scheme, or some or all of the Individual Defendants may not have been involved in whatever scheme there may have been, but those are matters to be addressed after defendants have answered. They have enough information to allow them to do that.[14]

### C. PROXY MATERIALS

■ The Hagerty plaintiffs allege that the proxy statement issued by First Federal in obtaining approval of the plan to convert contained material omissions.[15] Defendants contend that the regulation of conversions is placed exclusively in the Board, and that therefore "to the extent the Plaintiffs are challenging the Proxy materials or the plan to convert," such allegations are exclusively within the jurisdiction of the Board. This is a somewhat obscure argument and, since it is alleged that the Offering Circular repeated the fraudulent omissions which supposedly tainted the proxy materials, it seems doubtful that it makes any difference which way the argument is decided. Nevertheless, it must be addressed.

Defendants are correct that "to the extent the Plaintiffs are challenging the ... plan to convert," this Court lacks jurisdiction. Three appellate decisions cited by the parties have all explained that a party whose real grievance is the plan to convert must press his claims with the Board, and that judicial review is in the Court of Appeals. *Rembold v. Pacific First Federal Savings Bank,* 798 F.2d 1307 (9th Cir. 1986), cert. denied 482 U.S. 905, 107 S.Ct. 2480, 96 L.Ed.2d 373 (1987); *Craft v. Florida Federal Savings & Loan Association,* 786 F.2d 1546 (11th Cir.1986); *Harr v. Prudential Federal Savings and Loan Association,* 557 F.2d 751 (10th Cir.1977), cert. denied 434 U.S. 1033, 98 S.Ct. 766, 54 L.Ed. 2d 780 (1978). Moreover, these cases are all unanimous in supporting the view that a party may not avoid this rule by attempting to dress up a challenge to the conver-

---

**14.** Defendants also cite *Shelter Mutual Insurance Co. v. Public Water Supply,* 747 F.2d 1195 (8th Cir.1984), a case with no apparent relevance here. That case merely held that a counterclaim defendant may not, consistently with Rule 9(b), incorporate the plaintiff's thirty-five page complaint into a one page answer and then seek to recover from the defendant/counterclaim plaintiff on the same grounds sought to be asserted by the plaintiff, without even indicating which allegations are relevant to the counterclaim defendant's particular cause of action. Except for confirming the presumably uncontested point that Rule 9(b) applies in the Eighth Circuit, the citation serves no purpose. Likewise inapplicable is *Antinore v. Alexander & Alexander Services, Inc.,* 597 F.Supp. 1361 (D.Minn.1984), where "[e]ssentially, all that the plaintiffs have alleged is that [defendant] is an aider and abetter because it issued D & O Insurance to [the principal defendant]." 597 F.Supp., at 1364. Closer to this case is the preceding opinion, *Antinore v. Alexander & Alexander Services, Inc.,* 597 F.Supp. 1353, 1360 (D.Minn. 1984), stating that all Rule 9(b) requires is that "plaintiffs set forth the time, place and circumstances of the alleged fraudulent activities," a requirement the Court found was met because "[t]he complaint states the relevant time period in which this activity occurred ... and the circumstances of the alleged fraud." *Stewart v.*

*Fry,* 575 F.Supp. 753, 756 (E.D.Mo.1983) is a case similar to this one, but the Rule 9(b) motion was filed by the bank's accounting firm, not by the defendants who were members of the board of directors. In the instant case, as in *Stewart,* the challenged actions of the Individual Defendants in making their collective decision are clearly alleged. Finally, *St. Louis Home Insulators, Inc. v. Burroughs Corp.,* 597 F.Supp. 100 (E.D.Mo.1984), aff'd 793 F.2d 954 (8th Cir. 1986), cert. denied 479 U.S. 1021, 107 S.Ct. 672, 93 L.Ed.2d 723 (1986), concerned traditional fraud in a face-to-face sale of goods. What a plaintiff can reasonably be expected to plead in those circumstances is considerably different from what a plaintiff can plead with regard to an alleged fraud on the stock-buying public by means of a corporate entity.

**15.** Plaintiffs' Brief in Opposition claims the Hagerty plaintiffs allege "that the proxy statement contained omissions of material fact which were relied upon by those plaintiffs in making the investment decision to purchase shares of First Federal common stock during the Community Offering." As discussed above in connection with the presumptions of reliance, that is more or less exactly what plaintiffs do not allege. If they wish to allege express reliance, they should amend their Complaint to so state.

sion plan as a securities fraud case. *Rembold,* 798 F.2d, at 1312; *Craft,* 786 F.2d, at 1553–54; *Harr,* 557 F.2d, at 754. Finally, the three decisions all either imply or expressly hold that a legitimate securities fraud claim is not pre-empted by the fact that the fraud occurred in connection with the conversion of a savings and loan. *Rembold,* 798 F.2d, at 1313; *Craft,* 786 F.2d, at 1554; *Harr,* 557 F.2d, at 754. Plaintiffs disavow any intention to challenge the plan of conversion, and defendants do not deny that securities fraud claims may be brought for omissions occurring in the Offering Circular, so the issue appears to be whether it is true that "to the extent the Plaintiffs are challenging the Proxy materials … said allegations must be dismissed."

Once it is understood what defendants are claiming, it is apparent that their contentions should only be accepted if the law absolutely compels that result. Appellate review of the Board's approval of a conversion plan is exclusively pursuant to 12 U.S.C. 1730a(k), which calls for an aggrieved party to contest the Board's order in a Court of Appeals, and to file its petition for review within thirty days of the date of publication of notice of the challenged order. It is apparently defendants' contention that this mechanism is the only way that an aggrieved party may challenge fraudulent statements in a proxy statement. But the Board does not purport to go behind the proxy statement; it makes no evaluation of the truth of the matters contained therein, it only checks for facial completeness and proper form.[16] Obviously, appellate review is not a proper means for developing a factual record concerning fraud. In other words, defendants argue that the approval of the Board, at least

after thirty days, immunizes any untrue statements in the proxy materials from further review, even though the Board does not pass on the truth of the statements as part of its regulatory function. Defendants contend no less than that there is no meaningful remedy for fraudulent proxy statements.

Defendants can reach this conclusion only by omitting an unambiguous statement to the contrary from the long *Harr* quotation which they present at pages 28–9 of their Brief in Support. As the Court explained in a portion of the opinion defendants omit from their brief,

> This case concerns especially changes made in the Housing Act and also in section 12 of the Exchange Act made by Public Law 93–495. These changes placed the responsibility for supervision of proxy solicitations used in conversions, such as the one here concerned, with the [Board]. The [Board] by this Act was directed to adopt regulations covering the subject similar to those of the Securities and Exchange Commission. This was done by the [Board]. *See* 12 C.F.R. secs. 563b.1 et seq. These regulations as to proxy solicitation are almost identical to SEC Regulation 14A which contains a specific antifraud subsection. *It must be assumed that the private remedies available under SEC 14A as to fraud also exist under the counterpart Bank Regulations.*

557 F.2d, at 752–53. Congress did not intend for the shift of regulatory supervision from one agency to another to open the door to fraudulent proxy solicitation. Board approval of the proxy materials does not mean that all challenges to fraudulent statements and omissions in those materials are foreclosed.[17]

---

**16.** *See* the Board's proxy anti-fraud regulation: "The fact that a proxy statement or other soliciting material has been filed with or examined by the Corporation and authorized for use shall not be deemed a finding by the Corporation that such material is accurate or complete or not false or misleading, or that the Corporation has passed upon the merits of or approved any proposal contained therein. No representation contrary to the foregoing shall be made by any person." *See also, Harr,* 557 F.2d, at 753: "The

[Board] had approved the plan and had apparently examined the proxy material, but, of course, did not 'approve' it formally."

**17.** Defendants do not assert that Regulation 563b.3(h), the Rule 10b–5 type regulation adopted by the Board, does not create a private cause of action. *See* Hagerty Complaint, Count VII (alleging cause of action under Regulation 563b.3(h)). One would have thought that if Board approval of the proxy statement conferred upon it immunity from further challenge,

The Court sees an additional potential issue, but the parties have not briefed it, and there may be less here than meets the eye. As the *Harr* Court noted, the Board has adopted proxy solicitation anti-fraud regulations which are essentially the same as the SEC's Regulation 14A. The Board's regulation provides that:

No solicitation of a proxy by the applicant, its management, or any other person for the meeting to vote on conversion shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for such meeting which has become false or misleading.

12 C.F.R. 563b.5(g); *compare* 17 C.F.R. 240.14a–9 (SEC proxy anti-fraud provision). It is this regulation which *Harr* indicated creates a private cause of action just as Regulation 14A does. *See J.I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (section 14(a) of the Exchange Act, and Regulation 14A promulgated pursuant thereto, create a private cause of action).

However, plaintiffs do not allege a claim under 563b.5(g). They instead allege that the proxy statement contains the same sorts of fraudulent omissions as the Offering Circular, and that the proxy statements are part of the violation of Rule 10b–5 and the similar statutes and regulations. It is

not facially obvious that a proxy statement cannot, under the proper set of facts, constitute a violation of Rule 10b–5 simply because there is a more clearly applicable regulation. In any event, to repeat, the parties have not raised the issue. As to the issue that defendants do raise, that fraudulent omissions in the proxy statement can constitute no part of the plaintiffs' case because the proxy statement was approved by the Board, defendants are, in the Court's opinion, in error.

### D.   12(2) CLAIM

Plaintiff Gitlin amended his original complaint to add a claim under section 12(2) of the Securities Act, 15 U.S.C. 77*l*(2). Defendants respond that the Complaint does not allege the required privity between the defendants and the plaintiff, and also that a distinction drawn in section 12(2) between banks and savings and loans is irrational and violates the equal protection component of the Fifth Amendment.

#### 1.   Privity

Section 12(2) provides in pertinent part that a person who "offers or sells a security" by means of fraudulent statements or omissions "shall be liable *to the person purchasing such security from him.*" (Emphasis added.) Mr. Gitlin alleges that he purchased his shares in the Public Offering, but does not further identify from whom the purchase was made. The applicable regulation indicates that a converting savings and loan which wishes to make a Public Offering should do so "through an underwriter," which would apparently negate any privity between the issuer (First Federal) and Mr. Gitlin, absent some special circumstances.[18]   As defen-

---

then Board approval of the Offering Circular (*see* Regulation 563b.7(a)(3)) would have the same effect on that document.

**18.** Defendants go further, and affirmatively claim that the Public Offering was done through firm commitment underwriting, meaning that the underwriter had no recourse against First Federal for any losses it sustained from the re-sale of the stock to the public. Defendants rely on an unauthenticated copy of an underwriting agreement, which they have attached to

their Motion to Dismiss. This raises the question of the status of this document, which is certainly not admissible without some foundation more substantial than its attachment to a motion. *See* Fed.R.Civ.P. 56(e). Furthermore, defendants have made a motion to dismiss, not a motion for summary judgment. *See,* Fed.R. Civ.P. 12(b). The Court could convert the dismissal motion, and give the plaintiffs an opportunity to submit all supporting evidence in their possession, but instead chooses to exclude the evidence as authorized by Rule 12 for the rea-

dants point out, it is plaintiff's duty to plead all the elements of his claim, and he does not allege from whom he bought the stock. The question is whether he pleads sufficient special circumstances that he may circumvent the privity requirement.

Plaintiffs' efforts to avoid the privity argument begin unpromisingly, with an admission that Mr. Gitlin bought from an underwriter and the unlikely assertion that "[w]hat is significant is not which one of [the underwriters] he purchased from, however, but that the underwriters obtained the shares from the defendants, and immediately sold them to the public." That, however, is what underwriters do, and it is clear that all issuers are not therefore deemed in privity with whoever buys from the underwriters. (In fact, the underwriters are ordinarily required to complete sale of the stock within 45 days of the end of the subscription period, which makes immediate sale a legal obligation. 12 C.F.R. 563b.7(i).)

In their briefs, the parties are agreed that the Eighth Circuit had adopted a "substantial factor" test for identifying when one not actually selling a stock may be deemed a "seller" under section 12. The test was adopted in *Stokes v. Lokken,* 644 F.2d 779, 785 (8th Cir.1981), following the Fifth Circuit's lead in *Pharo v. Smith,* 621 F.2d 656, 665 (5th Cir.1980). However, a subsequent Supreme Court decision has made the discussion in the briefs more or less obsolete, and this issue will be decided in accordance with that decision.

In *Pinter v. Dahl,* — U.S. —, 108 S.Ct. 2063, 2075–83, 100 L.Ed.2d 658 (1988), the Court discussed the scope of seller liability under section 12(1) (sale of unregistered securities) of the Securities Act, and unequivocally rejected the "substantial factor" test. Though the Court expressly did not decide whether the term would have the same meaning under section 12(2) as under section 12(1), it noted that the relevant language in the two sections is identical and that courts and commentators have generally assumed that the concept is

the same in both. 108 S.Ct., at 2076 n. 20. Because the Eighth Circuit is one of those courts which has treated "seller" as having the same meaning in both sections, *see Stokes,* 644 F.2d, at 785 ("the term 'seller,' *for purposes of determining section 12 liability,* is not limited to one who actually transfers title" (emphasis added)), this Court will apply *Pinter* to plaintiff Gitlin's 12(2) claim.

The Supreme Court's discussion of the substantial factor test is extensive and unrelievedly harsh. 108 S.Ct., at 2079–82. It is not necessary for this Court to repeat that analysis, but the conclusion is unambiguous:

> The substantial-factor test reaches participants in sales transactions who do not even arguably fit within the definitions set out in section 2(3); it would add a gloss to the operative language of section 12(1) quite different from its commonly accepted meaning. We conclude that Congress did not intend such a gross departure from the statutory language. Accordingly, we need not entertain petitioner's policy arguments. Being merely a "substantial factor" in causing the sale of unregistered securities is not sufficient in itself to render a defendant liable under section 12(1).

108 S.Ct., at 2082.

One particular piece of the Court's analysis should also be reproduced here, for it strongly buttresses the conclusion that an issuer such as First Federal should not ordinarily be considered a seller, absent an actual sale to the plaintiff:

> Section 11 of the Securities Act, 15 U.S.C. section 77k, lends strong support to the conclusion the Congress did not intend to extend section 12 primary liability to collateral participants in the unlawful securities sales transaction. The section provides an express cause of action for damages to a person acquiring securities pursuant to a registration statement that misstates or omits a material fact. Section 11(a) explicitly enumerates the various categories of persons in-

sons that the proffered evidence is not necessary for this motion, and that a summary judgment

motion is obviously premature. *Cf.* Fed.R. Civ.P. 56(f).

volved in the registration process who are subject to suit under that section, including many who are participants in the activities leading up to the sale. There are no similar provisions in section 12 and therefore we may conclude that Congress did not intend such persons to be defendants in section 12 actions.

Section 11, together with section 10, 15 U.S.C. 77j, also suggest another reason why something like an actual sale is required by section 12(2). Sections 10 and 11 impose issuer liability for material misstatements and omissions in registration statements and prospectuses. Plaintiffs read section 12(2) so broadly that, as a practical matter, the activities of an issuer are always sufficient to make it a seller to anyone who buys from the underwriter. It is difficult to imagine why Congress would have seen the need for sections 10 and 11 if issuers can always be reached under section 12.

The Court in *Pinter* identified who is a seller and who is a buyer as follows:

the range of persons potentially liable [as sellers] under section 12(1) is not limited to persons who pass title. The inclusion of the phrase "solicitation of an offer to buy" within the definition of "offer" brings an individual who engages in solicitation, an activity not inherently confined to the actual owner, within the scope of section 12.... Determining that the activity in question falls within the definition of "offer" or "sell" in section 2(3), however, is only half of the analysis. The second clause of section 12(1), which provides that only a defendant "from" whom the plaintiff "purchased" securities may be liable, narrows the field of potential sellers.... The purchase requirement clearly confines section 12 liability to those situations in which a sale has taken place.... The requirement, however, does not exclude solicitation from the category of activities that may render a person liable when a sale has taken place. A natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase. For example, a securities vendor's agent who solicited the purchase would commonly be said, and would be thought by the buyer, to be among those "from" whom the buyer "purchased," even though the agent himself did not pass title.

Having indicated who were included as sellers and buyers, it was a simple matter for the Court to say what was a "purchase": "[t]he soundest interpretation of the term ... is as a correlative to both 'sell' and 'offer,' at least to the extent that the latter entails active solicitation of an offer to buy." 108 S.Ct., at 2077. "The language and purpose of section 12(1) suggest that liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." 108 S.Ct., at 2078.

Plaintiff Gitlin does not allege that any of the defendants either sold *him* his shares or solicited *him* to buy his shares. Even if defendants solicited purchases or sold shares to every other buyer of First Federal's shares, if they did not solicit Mr. Gitlin or sell to Mr. Gitlin, then Mr. Gitlin may not recover from them under section 12(2). Solicitation here clearly does not extend to the putting of shares on the market in the hope that they will be purchased, nor of taking any of the other steps necessary to make a public offering. Consequently, Mr. Gitlin must know who solicited him to buy the shares, if anyone, and who sold them to him, and discovery of these facts is not warranted. Plaintiffs' protestations of what might be the case do not meet their obligation to plead a claim showing they are entitled to relief. Discovery may be used to develop admissible evidence to substantiate a pleaded claim; it may not be used to fish around in the hopes that currently unsuspected facts will turn up which will allow such a claim to be pleaded. Mr. Gitlin's claim under Section 12(2) will be dismissed for failure to state a claim.

### 2. Equal protection.

■ Defendants assert that banks are exempt from section 12(2), but savings and

loans are not. This, defendants contend, is irrational because there is no longer any meaningful difference between banks and savings and loans. Since the Securities Act creates an irrational distinction, unrelated to a legitimate government purpose, defendants contend it violates the equal protection component of the Fifth Amendment. *Schweiker v. Wilson,* 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981). To understand this argument, it is necessary to retrace a bit of legislative history.

The Securities Act exempts a number of classes of securities from its provisions. Section 3(a)(2), 15 U.S.C. 77c(a)(2), exempts, among a long list of others, "any security issued or guaranteed by a bank." Section 3(a)(5)(A), 15 U.S.C. 77c(a)(5)(A), exempts "[a]ny security issued by a savings and loan association, ... which is supervised and examined by State or Federal authority having supervision over any such institution," with an exception not here relevant.

Turning to Section 12(2), we find that that section applies to "[a]ny person who offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section)" is liable for the stated misdeeds. To summarize, section 3 carves out an exemption for all securities of certain types, including bank issued securities and savings and loan issued securities. Section 12(2) applies even to those securities exempted by section 3, including savings and loan securities, except that it does not apply to securities exempted by subsection (a)(2) of section 3, which includes bank issued securities.

Defendants argue that at the time the Securities Act was passed, savings and loans could not sell capital stock and were limited to raising money by selling shares to account holders. Banks, on the other hand, could sell stock. Now, however, both types of institutions may sell stock, but only banks are exempt from section 12(2). Furthermore, defendants allege that there are no longer any meaningful differences between savings and loans, and so there should no longer be any differences between how their stock issues are regulated. This argument is specious.

First, it is not clear what the remedy would be if the Court found that the qualification to the exception to the exemption was irrational. Defendants argue that section 12(2) should not apply to savings and loans if it is not applied to banks. Logically, one could as well argue that if section 12(2) is applied to savings and loans, then it should equally apply to banks.

Second, subsection (a)(2) does not focus mainly on banks. Instead, it exempts an array of securities issued by institutions which are either arms of the government or which are heavily regulated under other regulatory regimes. For example, a "bank" is defined as "any national bank, or any banking institution organized under the laws of any State, territory, or the District of Columbia, the business of which is substantially confined to banking and is supervised by the State or territorial banking commission or similar official." Apparently Congress felt that the types of securities granted general exemption in section 3 need not be subjected to the full range of regulation established by the Securities Act. As to these otherwise exempted categories of securities, Congress decided that Section 12(2)'s buyer protections should nevertheless be applicable. However, not even that amount of protection was required for the types of securities listed in subsection (a)(2), presumably because extensive regulation already provided sufficient protection against seller fraud. Consequently, in deciding whether it is rational to distinguish between banks and savings and loans, the determinative fact is not whether both are in the banking business, but whether both are subject to equally extensive regulation apart from the securities laws.

Third, defendants' listing of the ways in which banks and savings and loans are supposedly alike is entirely unpersuasive as an effort to show that it is irrational to ever treat the two types of institutions differently. It is true that both are chartered by the federal government, but the fact that they are chartered under different

statutes suggests that there is a difference between them. It is also true that both are regulated by organs of the federal government, but so are railroads, trucks, worker safety, and a nearly indefinitely large list of activities and institutions. Not every federally regulated business is deemed a bank simply because both that business and banks are subject to regulation by organs of the federal government. The fact that banks and savings and loans are regulated by different organs supports the conclusion that these are different types of institutions.

Defendants concede that there are differences in the statutory requirements, but then conclude that none of the differences "bear any relationship to why federal savings and loan associations are not allowed to keep their Section 3 exemption as banks are allowed to in Section 12(2)." Under our Constitution, neither defendants nor this Court is entrusted with the power to decide whether the different functions and purposes served by banks and by savings and loans are at base the same, whether the regulatory schemes are functionally identical although they appear to be considerably different, or whether there is any longer a purpose to be served by the distinctions. When Congress decides that savings and loans should cease to be considered a different form of financial institution, it will, presumably, change the law accordingly. Until then, the distinction cannot be said to be irrational, and the fact that savings and loans are subject to 12(2) and banks are not is not the only manifestation of that distinction.

Defendants' argument that Congress nodded, and simply overlooked section 12(2) when it authorized savings and loans to sell capital stock is dubious as a matter of fact and even more dubious as a matter of legal theory. Subsection (a)(5) was amended as recently as 1987, Pub.L. 100–181, sec. 204, so the exemption of savings and loans from the normal operation of the Securities Act has been somewhat on Congress's mind. It is implausible to think that Congress decided to make the relatively technical correction made by the 1987 amendment, but absent-mindedly overlooked the fact

that 12(2) continued to apply to savings and loan stock. The best guess would be that Congress still considers savings and loans to differ from banks so that 12(2) should continue to apply to savings and loans.

In any case, the Court is not permitted to revise the statute books as it thinks fit in order to best effectuate what it believes are Congress's larger purposes. Defendants' argument boils down to the claim that Congress wanted the two types of institutions treated the same, but just did not think carefully enough about how that should be accomplished. Defendants should address their argument to Congress.

Finally, the fact that both banks and savings and loans may be said, for certain purposes, to be "in the business of banking" does not mean that it is always impermissible to treat the two as different. Sharks and Huck Finn are both in the business of fishing, but they may be treated differently. Carried to its logical conclusion, of course, defendants contention would require savings and loans to be regulated by the FDIC and would ban the making of any distinctions between the institutions. To say that the only difference between banks and savings and loans is that they are chartered differently, regulated differently, organized differently, and intended for different purposes, and that these "minor" differences are overcome by the fact that they both accept deposits, make commercial loans, and cash checks, is patently unconvincing.

## CONCLUSION

Nothing the Court has said should be construed as a finding that there is any merit to any of plaintiffs' allegations. The Court merely holds that plaintiffs may go forward past the pleading stage. In the case of some claims, such as the *Affiliated Ute* presumption, nothing more than a request for admission may be necessary for defendants to defeat the plaintiffs' position. Other issues will likely require further exploration, but that remains to be seen. For now, with the exception indi-

cated, plaintiffs have alleged enough to defeat defendants' motions to dismiss.

## ORDER

IT IS THEREFORE ORDERED that:

a) defendants' motion to dismiss is GRANTED as to plaintiff Gitlin's assertion of a claim under section 12(2) of the Securities Act, 12 U.S.C. 77$l$(2) (Case No. LR–C–87–793); and

b) the balance of defendants' motion to dismiss in Case No. LR–C–87–793, and the entirety of the motion to dismiss in Case No. LR–C–87–792, is DENIED.