**PPM AMERICA, INC., et al., Plaintiffs,**

v.

**MARRIOTT CORPORATION, et al., Defendants.**

**Civ. No. H–92–3068.**

United States District Court, D. Maryland.

May 23, 1994.

---

14. This is consistent with Supreme Court precedent holding that a veteran must demonstrate with reasonable, but not absolute, certainty that he would have received the benefits in question absent a leave for military purposes. As the Court has stated:

It would be virtually impossible for a veteran to show ... that it was absolutely certain "as a matter of foresight" when he entered military service, that all circumstances essential to obtaining an advancement in status would later occur. To exact such certainty as a condition for insuring a veteran's seniority rights would render these statutorily protected rights without real meaning.... In light of the purpose and history of the statute, however, we cannot assume that Congress intended possibilities of this sort to defeat the veteran's seniority rights. *Tilton v. Missouri Pac. R.R.*, 376 U.S. 169, 180–81, 84 S.Ct. 595, 602, 11 L.Ed.2d 590 (1964).

15. The government also has not made a request, pursuant to Fed.R.Civ.P. 56(f), for a continuance to obtain affidavits or other sworn testimony.

16. *See Tilton v. Missouri Pac. R.R.*, 376 U.S. 169, 174, 84 S.Ct. 595, 599, 11 L.Ed.2d 590 (1964) (discussing early versions of the statute protecting seniority rights of veterans); *Camacho v. Public Serv. Comm'n*, 450 F.Supp. 231, 233 (D.P.R.1978) (same).

Lawrence Kill, Steven Cooper and Anderson, Kill, Olick & Oshinsky, New York City, for plaintiffs.

Arne M. Sorenson and Latham & Watkins, Washington, DC, and Richard J. Magid and Whiteford, Taylor & Preston, Baltimore, MD, for defendants.

ALEXANDER HARVEY, II, Senior District Judge.

Following extensive pretrial proceedings in this civil action and a lengthy period of discovery, the parties have completed discovery and have now filed motions for summary judgment. Presently pending are defendants' motion seeking summary judgment as to all claims of all plaintiffs and counterclaim defendants' motion seeking summary judgment as to the counterclaim of defendant Marriott Corporation.[1] The Court has considered extensive memoranda and volumi-

---

1. The counterclaim defendants are thirteen of the sixteen named plaintiffs. Only defendant Marriott Corporation has filed a counterclaim in this case.

nous exhibits submitted both in support of and in opposition to these two motions. Oral argument has been heard in open court. For the reasons to be stated, the Court has concluded: (1) that defendants' motion for summary judgment must be granted in part and denied in part; and (2) that the motion of the counterclaim defendants seeking summary judgment as to the counterclaim must be granted.

Defendants' motion for summary judgment was originally directed to all remaining claims of the plaintiffs in Civil No. H–92–3068, this action, as well as to all remaining claims of the plaintiff in *State Board of Administration of Florida v. Marriott Corp., et al.*, Civil No. H–93–876. At the time of the filing of defendants' motion for summary judgment, these two cases were consolidated pursuant to the Court's Order of September 27, 1993. Subsequent to the briefing and argument of defendants' motion for summary judgment, defendants and the plaintiff in Civil No. H–93–876 reached a settlement. On May 17, 1994, this Court entered an Order severing Civil No. H–93–876 from Civil No. H–93–3068 and dismissing the complaint in Civil No. H–93–876. Accordingly, the Court will now address only those portions of defendants' motion for summary judgment which pertain to the claims of plaintiffs asserted in the remaining case, namely Civil No. H–92–3068.[2]

## I

### *Summary Judgment Principles*

As set forth in Rule 56(c), F.R.Civ.P., the standard for the granting of a motion for summary judgment is that the moving party must show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law." One of the purposes of Rule 56 is to require a party, in advance of trial and after a motion for summary judgment has been filed and supported, to come forward with some minimal facts to show that it may not be liable under the claims alleged or subject to the defenses asserted. *See* Rule 56(e). A "mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir.1967)). In the absence of such a minimal showing, a party moving for summary judgment should not be required to undergo the expense of preparing for and participating in a trial of the issue challenged. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The burden is on the party moving for summary judgment to show that no genuine issue of fact exists and that the movant is entitled to judgment as a matter of law. *Barwick*, 736 F.2d at 958. This burden may be met by reliance on affidavits, exhibits, depositions and other discovery materials. *Id.* However, "[t]he facts, and the inference to be drawn from the facts, must be viewed in the light most favorable to the party opposing the motion." *Ballinger v. North Carolina Agricultural Extension Serv.*, 815 F.2d 1001, 1004–05 (4th Cir.1987) (Timbers, J.), *cert. denied*, 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987) (citing *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985)).

When these principles are applied to the facts established by the massive record in this case, this Court has concluded that the

---

**2.** The plaintiffs in this case are: PPM America, Inc ("PPM America"); London Pacific Life & Annuity Company ("London Pacific"); Transamerica Life Insurance & Annuity Company ("Transamerica Life"); Transamerica Income Shares, Inc. ("Transamerica Income"); National Home Life Assurance Company ("National Home"); Commonwealth Life Insurance Company ("Commonwealth Life"); Provident Mutual Life Insurance Company of Philadelphia ("Provident Mutual"); Vanguard Fixed Income Securities Fund, Inc. ("Vanguard"); Wellington Fund, Inc. ("Wellington Fund"); Anchor Series Trust ("Anchor Series"); High Yield Plus Fund, Inc. ("High Yield"); New America High Income Fund, Inc. ("New America"); Security Mutual Life Insurance Company of New York ("Security Mutual"); Security Equity Life Insurance Company ("Security Equity"); Utica National Life Insurance Company ("Utica National"); and Peoples Security Life Insurance Company ("Peoples Security").

defendants' motion for summary judgment must·be granted in part and denied in part and that the counterclaim defendants' motion for summary judgment must be granted.

## II

### Defendants' Motion for Summary Judgment

At an early stage of these proceedings, defendants filed a motion to dismiss the first amended complaint, or, in the alternative, for summary judgment. Following a hearing, the Court, in its Memorandum and Order of April 22, 1993, treated the motion solely as a motion to dismiss and granted it in part and denied it in part. *PPM America, Inc. v. Marriott Corporation,* 820 F.Supp. 970 (D.Md.1993). Defendants' motion to dismiss Counts I, II, III and IV of the first amended complaint was denied, and their motion to dismiss Count V was granted. *Id.* at 980. In addition, all of plaintiffs' claims based upon bonds purchased before April of 1992 were dismissed. *Id.*

The following counts of the first amended complaint (hereinafter the "complaint") remain:

Count I, alleging a violation of § 11 of the Securities Act of 1933, 15 U.S.C. § 77k;

Count II, alleging a violation of § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*;

Count III, alleging a violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5, 17 C.F.R. § 240.10b–5 (hereinafter the "Rule 10b–5 claims"); and

Count IV, alleging common law fraud.

Defendants have moved for summary judgment as to all of these claims, and have presented essentially six arguments in support of their motion:

(1) That the plaintiffs have produced no evidence that defendants made any false statement or omission of material fact which defendants were under a duty to disclose prior to the purchase by any of the plaintiffs of Marriott notes;

(2) That the plaintiffs have produced no evidence that defendants acted with the scienter necessary to sustain a claim under Rule 10b–5 and a claim of fraud under Maryland law;

(3) That the plaintiffs have produced no evidence that they relied upon the alleged false statements or omissions of material fact;

(4) That defendants were not "sellers" of Marriott notes and therefore may not be held liable under § 12(2) of the Securities Act of 1933;

(5) That 13 of the plaintiffs have suffered no damages cognizable under § 11 and § 12(2) of the Securities Act of 1933; and

(6) That plaintiff Vanguard failed to opt-out of the class action settlement.

### (a)

#### Background

In the latter part of April of 1992, Marriott Corporation (hereinafter "Marriott") issued $400 million face value of Series L and Series M bonds. The Series L bonds were issued on April 22, 1992, and the Series M bonds were issued on April 28, 1992. The initial public offerings of the Series L and M bonds (hereinafter the "IPOs") were made through various underwriters. In conjunction with the IPOs, Marriott filed with the United States Securities and Exchange Commission (hereinafter the "SEC") Registration Statements which included Prospectuses and Prospectus Supplements for the Series L and M bonds. These documents incorporated by reference Marriott's Annual Report on Form 10–K, which had been filed with the SEC earlier in April of 1992 (hereinafter the "Form 10–K"), and also Marriott's Current Report on Form 8–K, which had been filed with the SEC on April 21, 1992 (hereinafter the "Form 8–K"). Between April 22, 1992 and October 5, 1992, the plaintiffs purchased approximately $130 million face value of Marriott notes, including but not limited to the Series L and M bonds. These bonds were purchased both at their IPOs and subsequently on the open market.

On October 5, 1992, less than six months after the IPOs, Marriott announced a major restructuring whereby it would, in essence,

be divided into two new corporations (hereinafter the "Transaction"). The Transaction took the form of a distribution as a tax-free special dividend to Marriott's common stockholders of all of the common stock of Marriott International, Inc. (hereinafter "Marriott International"), a subsidiary of Marriott. Marriott International would own the bulk of Marriott's lodging, services and management operations. These activities accounted for more than 50% of Marriott's cash flow. Marriott itself would be renamed Host Marriott Corporation (hereinafter "Host Marriott"). Host Marriott would own the bulk of Marriott's real estate properties, the value of which had in the early 1990's become significantly depressed as the result of a poor real estate market. Host Marriott was to be responsible for all of Marriott's long term debt, including the bonds purchased by the plaintiffs.

The securities markets reacted swiftly to the announcement of the Transaction. The price of Marriott common stock rose sharply, while the price of Marriott bonds plummeted. Marriott's bondholders also reacted quickly, filing on October 9, 1992 the first of 10 separate suits instituted in this Court by purchasers of Marriott bonds. *United Apple Sales, Inc., et al. v. Marriott Corp., et al.,* Civil No. H–92–2858 (Consolidated). For purposes of this Opinion, the complicated history of the ensuing litigation need not be detailed, except as such history may otherwise be relevant to the issues raised by the pending motions.

The primary factual dispute raised by defendants' motion for summary judgment concerns the history of Marriott's planning of the Transaction. This issue of fact in turn centers primarily around the thoughts and actions of defendant Stephen F. Bollenbach, alleged by plaintiffs to be the primary architect of the Transaction. Bollenbach became Marriott's Chief Financial Officer (hereinafter "CFO") on March 1, 1992.

Plaintiffs contend that Bollenbach was hired by Marriott for the purpose of developing a plan whereby Marriott might dispose of its depressed real estate holdings. It is undisputed that Marriott's strategy throughout the 1980's was to purchase real estate, build hotels on the real estate, and then sell the hotel properties while retaining management contracts. The parties agree that Marriott's strategy of selling real estate while retaining management contracts was well publicized and was well understood by the securities markets. The parties further agree that this strategy, which had served Marriott profitably through the 1980's, began to falter in 1990 when the real estate market became depressed and Marriott could no longer easily dispose of its real estate holdings. Because Marriott could no longer generate sufficient cash flow for its operations from the sale of its real estate properties, it was forced to incur a substantial amount of additional debt, much of which took the form of bank loans made under revolving credit agreements. The difficulties encountered by Marriott in selling its real estate properties and its increasing debt caused a decline in the price of Marriott's common stock.

During 1991, Marriott undertook various steps in an effort to reduce its debt burden, including the issuance of liquid yield option notes (hereinafter "LYONS") and preferred stock. However, the issuance of the LYONS and the preferred stock did not ultimately have a significant positive effect either on Marriott's debt burden or on the price of its common stock. It was this economic situation which plaintiffs contend forced Marriott in early 1992 to begin consideration of a major corporate restructuring.

In January of 1992, Marriott began to court Bollenbach, an acknowledged expert in the field of corporate restructurings. In the late 1980's, Bollenbach had successfully engineered a number of major restructurings. Plaintiffs have pointed to one in particular which they contend was very similar in form to the Transaction. From 1986 through 1990, Bollenbach was the Chief Financial Officer of Holiday Corporation (hereinafter "Holiday"), which later became known as Promus Companies, Inc. In 1990, Bollenbach implemented a restructuring whereby a tax-free special dividend of stock of a subsidiary of Holiday was distributed to Holiday's stockholders. This subsidiary owned certain cash generating assets. Under the plan, Holiday's real estate and debt remained in

the parent corporation. The parties have referred to this transaction as the "Promus spin-off." Professor Roger G. Ibbotson, an expert witness retained by plaintiffs, testified at his deposition that the Promus spin-off was similar in certain significant respects to the Transaction. Defendants, in turn, contend that the Promus spin-off and the Transaction were markedly different.

On February 13, 1992, Bollenbach met with Matthew J. Hart, Marriott's Treasurer. They discussed the problems being encountered by Marriott in its efforts to sell its real estate properties. Hart indicated that he intended to assign various Marriott individuals to analyze various possible solutions, and Hart and Bollenbach at this early date discussed the possibility of a "spin-off" of Marriott's real estate. Bollenbach officially began working for Marriott on March 1, 1992. Five days later, on March 6, 1992, he received a memorandum from Hart which outlined three possible strategies to be considered . and named the individuals who had been assigned to analyze each of the strategies. The memorandum of March 6, 1992 stated as follows:

1. *Grind it out* (Carolyn Handlon)—Continue to sell assets at or above present value of holding. Pay down the debts to improve credit rating, balance credit needs with desire to maximize E.P.S.
2. *Split Up* (David Chichester)—Divide company into component parts—asset based and service based. Capital structure would follow.
3. *Hold 'Em* (Ray Murphy)—Withdraw from active efforts to dispose of real estate until market improves. Replace 'relationship' lenders with generic funding and ride out the storm.

As early as January of 1992, Chichester, Marriott's Vice President of Project Finance, and Scott LaPorta, Marriott's Director of Corporate Finance, had begun work on a possible "split up" option. Chichester and LaPorta started to work with analysts from investment bank First Boston Corporation (hereinafter "First Boston"), on a project known as "Code Red." From January, 1992 until early April, 1992, investment bankers at First Boston worked closely with Chichester

and LaPorta on Code Red. First Boston ultimately produced an extensive memorandum containing its analysis of the "split up" option (hereinafter the "Code Red Book"). First Boston clearly understood that the essential purpose of Code Red was to separate Marriott's real estate holdings from its other operations in order to increase the value of Marriott's common stock.

On April 3, 1992, representatives of First Boston presented the Code Red Book to Marriott at a meeting at Marriott's headquarters. Attending this meeting were, among others, Bollenbach and Hart. At this meeting, Bollenbach expressed reservations about certain aspects of Code Red. Both Bollenbach and Chichester have testified that soon after the April 3, 1992 meeting, they reached a decision not to pursue Code Red. As they did with reference to the Promus spin-off, the parties dispute the extent to which Code Red was similar to or different from the Transaction. The plaintiffs emphasize the fact that Code Red involved the placing of Marriott's real estate holdings into a new, separate corporation. Defendants emphasize the fact that no final decision was ever reached concerning the entity where Marriott's debt would end up in the Code Red proposal, and defendants assert that it was possible that Code Red might, in fact, have been beneficial to Marriott's bondholders. The parties' experts are in sharp disagreement concerning the degree of and the significance of the similarities and differences between Code Red and the Transaction.

In a memorandum of April 16, 1992, from Bollenbach to J.W. Marriott, Jr., Marriott's Chairman, Bollenbach outlined his objectives as CFO for the year 1992. The April 16, 1992 memorandum stated in part as follows:

### I. Revise 'Marriott Story'

Lead an effort to review and re-evaluate Marriott Corporation financial and operational strategy for the 1990s.

During the 1980s the company relied on creating shareholder value by accomplishing a specified growth rate and return on equity.

The method of achieving growth (Hotel development and acquisition or service businesses and the creation of some business de novo) in the 1980s is not applicable to the 1990s.

We will need to adopt a different approach to creating shareholder value.

My objective is to secure consensus as to that approach and document that approach.

The objective will be accomplished by the end of the summer.

We will launch an effort in the fall to tell the revised "Marriott Story" to our shareholders and the investment community.

Plaintiffs contend that this memorandum demonstrates that by Mid–April of 1992, Bollenbach was considering a major change in Marriott's financial strategy, and that he had already concluded that Marriott's old strategy of developing and then selling hotels was no longer viable. Plaintiffs also point out that the time frame mentioned in the memorandum, namely to accomplish the change by the "end of the summer," closely tracks the actual announcement of the Transaction.

On April 22 and 28, 1992, Marriott issued the Series L and M bonds. Plaintiffs contend that in the various documents incorporated into the Prospectuses pursuant to which the Series L and M bonds were issued, Marriott affirmatively represented that it would use its cash flow from its management operations to service its debt, including the Series L and M bonds. Marriott's Form 10–K stated that Marriott "bases target debt levels on cash flow coverage of interest," and stated that for 1991, the cash flow coverage of interest "was 2.1 times, and substantially exceeded the requirements of the Company's lenders."

Defendants contend that Bollenbach first conceived of the Transaction during the weekend of May 2 and 3, 1992. Notably, this was less than one week after the issuance of the Series M bonds. Bollenbach testified that on Monday, May 4, 1992, he first discussed the idea for the Transaction with William Kafes, Marriott's Associate General Counsel for Corporate Affairs. Later that week, Bollenbach spoke to J.W. Marriott, Jr.

concerning the idea. By the middle of May, 1992, Bollenbach had begun to discuss the plan with various outside investment bankers.

On June 4, 1992 Bollenbach first presented his idea to Marriott's Board of Directors, which approved further development of the idea. On October 1, 1992, the final version of the Transaction was presented to Marriott's Board of Directors. The Transaction was approved by the Board on October 4, 1992, and was publicly announced on October 5, 1992, the next day.

(b)

*Materiality*

In order to prevail under any of the remaining counts of the complaint, the plaintiffs must prove that defendants made a false statement or omission of material fact. To the extent that plaintiffs' claims rest upon alleged omissions, plaintiffs must ultimately prove, *inter alia,* (1) that defendants omitted a material fact, and (2) that defendants were under a "duty to disclose" the omitted fact. *E.g., Taylor v. First Union Corp. of South Carolina,* 857 F.2d 240, 243 (4th Cir.1988), *cert. denied,* 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989).

Insofar as the issues raised by their motion for summary judgment are concerned, defendants have conceded that they were under a duty to disclose all material facts at the time of the IPOs. Thus, with respect to plaintiffs' claims based upon Marriott notes purchased at the time of the IPOs, the only issue presented by the pending motion is one of materiality. Different considerations pertain to plaintiffs' claims based on notes purchased *after* the IPOs. Defendants argue that after the IPOs, they had no duty to disclose the planning of the Transaction. Thus, with respect to plaintiffs' claims based upon notes purchased after the IPOs, the pending motion presents issues both of materiality and of the existence of a duty to disclose. For the reasons to be stated hereinbelow, the Court has concluded that genuine issues of fact exist concerning whether or not defendants failed to disclose material facts at the time of the IPOs. Accordingly, there is not need for the Court at this time to address the question of whether or not de-

fendants were under a duty to disclose material facts at some point in time after the IPOs, but prior to October 5, 1992.

"The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 445, 96 S.Ct. 2126, 2130, 48 L.Ed.2d 757 (1976). The Supreme Court in *TSC Industries* articulated the standard for determining when an omission would be considered material for purposes of a claim under § 14(a) of the 1934 Act as follows:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote ... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

*Id.* at 449, 96 S.Ct. at 2132.

Subsequently, the Supreme Court expressly adopted the *TSC Industries* standard of materiality "for the § 10(b) and Rule 10b–5 context." *Basic Inc. v. Levinson,* 485 U.S. 224, 232, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). This same standard of materiality has been applied by various courts in connection with claims asserted under other provisions of the federal securities laws which prohibit false statements or omissions of material fact. *See* IV L. Loss & J. Seligman, *Securities Regulation* at 2063, n. 372 (3rd ed. 1990) (collecting cases). Furthermore, the standard of materiality for purposes of common law fraud is essentially identical to the standard set forth in *TSC Industries.* Restatement (Second) of Torts, § 538 (1977) (matter is material if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question"), *cited with approval, Golt v. Phillips,* 308 Md. 1, 10, 517 A.2d 328 (1986). Thus, in order to prevail on any of the claims asserted in this case, plaintiffs must prove that defendants' alleged false statements and omissions were material as that term was defined in *TSC Industries.*

A corporation's consideration of a major change in corporate form can be material even if there is only a probability that the change will occur or if it is merely contingent upon future events. In *Basic Inc.,* the Supreme Court considered the issue concerning when negotiation of a corporate merger would be considered material. The Court held that the materiality of a contingent event "will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." 485 U.S. at 238, 108 S.Ct. at 987 (quoting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2nd Cir.1968) (*en banc*)). The Court then went on to consider the means by which a factfinder could determine the "probability" and "magnitude" of a potential merger. In this respect, the Court in *Basic Inc.* stated:

> Whether merger discussions in any particular case are material therefore depends on the facts. Generally, in order to assess the probability that the event will occur, a factfinder will need to look to indicia of interest in the transaction at the highest corporate levels. Without attempting to catalog all such possible factors, we note by way of example that board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries may serve as indicia of interest. To assess the magnitude of the transaction to the issuer of the securities allegedly manipulated, a factfinder will need to consider such facts as the size of the two corporate entities and of the potential premiums over market value. No particular event or factor short of closing the transaction need be either necessary or sufficient by itself to render merger discussions material.

485 U.S. at 239, 108 S.Ct. at 987.

In *Basic Inc.*, the Supreme Court specifically refused to adopt a bright-line test which would have considered the disclosure of facts pertaining to merger negotiations immaterial as a matter of law until the parties had reached an agreement-in-principle. *Id.* 485 U.S. at 236, 108 S.Ct. at 986. However, in cases decided after *Basic Inc.*, a number of courts, including the Fourth Circuit, have held that certain preliminary merger negotiations are immaterial as a matter of law, and that summary judgment may properly be granted in favor of defendants in such cases. *Taylor*, 857 F.2d at 244; *Jackvony v. RIHT Financial Corp.*, 873 F.2d 411, 413–415 (1st Cir.1989); *Glazer v. Formica Corp.*, 964 F.2d 149, 155 (2nd Cir.1992). In those cases, the Courts have concluded that no reasonable investor would have considered that disclosure of the preliminary negotiations would have significantly altered the "total mix" of information available.

■ Plaintiffs contend that in cases involving internal restructuring, consideration of the formation of a new corporate structure becomes material at an earlier point in time. This contention is supported most strongly by *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726 (2nd Cir.1987). *Kronfeld* concerned a decision by Trans World Corporation (hereinafter "TWC") to sell one of its major subsidiaries, Trans World Airlines (hereinafter "TWA"). The Court in *Kronfeld* first considered cases holding preliminary merger negotiations immaterial as a matter of law. The Court described the rationale of these cases as follows:

> [T]he application of a different rule [in preliminary merger negotiation cases] could scuttle corporate deals, costing shareholders desirable merger premiums, either because acquiring corporations generally insist on negotiating mergers in confidence and may terminate a deal that is disclosed prematurely, or because early disclosure may drive the target corporation's stock price so high as to make merger consummation economically unfeasible.

832 F.2d at 734. The Court went on to characterize the preliminary merger negotiation cases as a "policy exception" to the *Texas Gulf Sulphur* formulation of materiality. *Id.* at 735.

The Court in *Kronfeld* distinguished cases involving a corporation's internal restructuring from cases involving mergers, reasoning that corporate defendants have far greater control over internal restructurings than over merger negotiations. *Id.* Thus, the probability that preliminary consideration of an internal restructuring will actually result in a change in the structure of the corporation is far greater than the probability that preliminary merger negotiations will actually result in a merger. A reasonable investor is therefore likely to give greater weight to early signs of an internal restructuring than to early signs of a merger. In *Kronfeld*, the Second Circuit held that a genuine issue of material fact had been raised as to whether or not TWC's consideration of a sale of TWA was material at a particular point in time even though the sale of TWA had been presented to the board of TWC as only one of seven possible strategies for increasing the value of TWC's stock. *Id.*

Insofar as the issue of materiality is concerned, the first question which the Court must consider is whether planning of the Transaction became a material event prior to the IPOs in late April of 1992.[3] After due consideration of the record now before it, the Court has concluded that a genuine issue of material fact is presented with respect to this issue. When viewed in a light most favorable to plaintiffs, there are inferences which may be drawn from the facts of record which support plaintiffs' position on the issue of materiality. Although deposition testimony and other evidence of record supports defendants' position on the issue of materiality, a summary judgment hearing is not the proper forum for assessing the relative weight of conflicting evidence. *Potomac Valve & Fitting, Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1285 n. 10 (4th Cir.1987) (citing *Ross, supra* ).

---

**3.** As noted hereinabove, defendants have conceded that if Marriott's consideration of the Transaction was material at the time of the IPOs, then Marriott was under a "duty to disclose" such material facts.

As early as January of 1992, high level executives and employees of Marriott were considering dividing Marriott into two separate corporations. In particular, Chichester and LaPorta were working with First Boston on Code Red. By no later than March of 1992, two of Marriott's high level officers, Hart and Bollenbach, were aware of and interested in the idea of "spinning off" or otherwise divesting Marriott of its real estate holdings. At this point in time, the "spin off" or "split up" idea was only one of a number of various alternatives which were being considered.

On April 3, 1992, the Code Red Book was presented to Marriott executives, including Bollenbach and Hart. A reasonable factfinder could conclude that as of April 3, 1992, Marriott's consideration of Code Red had become a material event. Although Marriott had certainly not finally committed itself to the Code Red plan, the proposal was being considered "at the highest corporate levels." *Basic Inc.*, 485 U.S. at 239, 108 S.Ct. at 987. Moreover, the magnitude of the change being contemplated by Code Red was significant.

Defendants contend, *inter alia*, that Code Red could not have been material insofar as Marriott's bondholders were concerned because no final decision was ever reached with respect to which of the two new corporations would be liable for Marriott's debt. However, this circumstance does not render Code Red immaterial as a matter of law. Professor Ibbotson testified at his deposition that the mere division by a corporation of its assets will usually, though not necessarily, be harmful to bondholders. Thus, had Marriott disclosed to prospective purchasers of its bonds its consideration of Code Red, the market value of the bonds might have decreased, even though all the precise details of the proposed transaction were not available. A reasonable investor could have viewed disclosure of Marriott's consideration of Code Red as having significantly altered the "total mix" of information available, particularly since Code Red indicated a high level of interest within Marriott in a major internal restructuring. *See, Kronfeld,* 832 F.2d at 735.

Defendants argue that Marriott had abandoned the idea of splitting itself into two separate companies at some point in time prior to the April 22, 1992 issuance of the Series L bonds. Defendants rely on Bollenbach's testimony that he first conceived of the Transaction on May 2, 1992, four days after Marriott had issued the Series M bonds on April 28, 1992. According to defendants, *at the time of the IPOs,* Marriott was considering neither Code Red nor Bollenbach's allegedly new idea for the Transaction. On the record here, this Court concludes that a reasonable factfinder could reject this contention.

Defendants' contentions concerning the date when Marriott rejected Code Red and when Bollenbach first conceived of the Transaction are based almost exclusively upon the testimony of Bollenbach and other key employees of Marriott. In disputing this testimony, plaintiffs rely upon evidence and inferences indicating that the Promus spin-off and Code Red were early versions of what ultimately became the Transaction. According to plaintiffs, Bollenbach's testimony that he first conceived of the Transaction on May 2, 1992 is refuted by this and other substantial evidence in the record.

Genuine issues of fact arise with respect to the similarities and differences between the Promus spin-off and the Transaction and between Code Red and the Transaction. Inferences derived from these and other facts, including the fact that Bollenbach has testified that he conceived of the Transaction only a few days after the IPOs, would permit a reasonable factfinder to conclude that at the time of the IPOs Marriott was still actively considering a major restructuring involving the division of Marriott into two new corporations. Undoubtedly, Bollenbach's testimony and other substantial evidence in the record supports defendants' position that information concerning the Transaction was not material at the time of the IPOs under the *Basic Inc.* standard. However, it is the jury which must decide the issue of Bollenbach's credibility and the weight to be given his testimony. Those questions cannot be resolved by way of a motion for summary judgment. The weight and credibility of con-

flicting testimony and inferences are not issues to be decided by the trial judge in a summary judgment proceeding. *Summerlin v. Edgar,* 809 F.2d 1034, 1039 (4th Cir.1987).

Having reached this conclusion, the Court need not now address the issue of whether, if Marriott's consideration of the Transaction became material only *after* the IPOs, defendants at some later date had a duty to disclose. There is no merit to defendants' argument that the complaint did not allege such an alternative claim. Although the majority of the notes held by the plaintiffs were purchased at the time of the IPOs, some were purchased on the open market as late as October 2, 1992. Whether or not as a matter of strategy, plaintiffs would want to press this alternative theory or whether it will be abandoned can be determined at the time of the final pretrial conference. If the claim is not abandoned, defendants may renew their argument that they had no duty to disclose Marriott's consideration of the Transaction at any time between late April and October 5, 1992.

### (c)

#### Scienter

■ In *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976), the Supreme Court held that a plaintiff asserting a private cause of action under § 10(b) of the 1934 Act and Rule 10b–5 must prove that the defendant acted with scienter. The Supreme Court defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." *Id.* at 193, n. 12, 96 S.Ct. at 1381, n. 12. This Court has held that "recklessness is sufficient to fulfill the scienter requirement for a Rule 10b–5 action." *Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 464 F.Supp. 528, 537 (D.Md.1978). Scienter may be established by inferences derived from circumstantial evidence. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 691 n. 30, 74 L.Ed.2d 548 (1983). The parties are in

agreement that these basic legal principles are applicable in this case.

■ Defendants essentially argue that because evidence is lacking that they made any false statements or omissions of material fact, it necessarily follows that they could not possibly have acted with scienter.[4] In opposition, plaintiffs contend that there is indeed evidence that defendants made false statements and/or omissions of material fact, and that defendants had an ample motive for so doing. In particular, plaintiffs rely on the fact that the Marriott family and Bollenbach had a substantial personal interest in the value of Marriott stock. Evidence of record indicates that the Marriott family holding of Marriott common stock increased in value by approximately $400 million following the October 5, 1992 announcement of the Transaction, and that in recognition for his work on the Transaction, Bollenbach received a bonus of $6,469,200 worth of restricted stock. According to the plaintiffs, defendants' personal motives, in conjunction with actual knowledge which the individual defendants had of their false statements and omissions, is sufficient circumstantial evidence of scienter to defeat the pending motion for summary judgment addressed to the issue of scienter. This Court would agree.

■ As discussed hereinabove, genuine issues of material fact are presented concerning whether or not defendants made material false statements or omissions at the time of the IPOs. If the jury finds that defendants did in fact make such material false statements or omissions, the jury could also reasonably find that defendants did so knowingly or recklessly *and that defendants had a motive for so doing.* Under these circumstances, the issue of whether or not defendants acted with the requisite scienter must be left for the factfinder at trial. *See Wechsler v. Steinberg,* 733 F.2d 1054, 1058 (2nd. Cir.1984) (in securities fraud case, "[i]ssues of motive and intent are usually inappropriate for disposition on summary judgment.")

---

4. No showing of scienter is required in order to prove a claim under § 11 or § 12(2) of the 1933 Act. Under § 11, an issuer's liability is essentially absolute. IX L. Loss & J. Seligman, *Securities Regulation* 4255 (3d ed. 1992) (hereinafter "IX Loss & Seligman"). A showing merely of negli-

gence is sufficient to sustain a claim under § 12(2). *Id.* at 4207. Under Maryland law, an element of common law fraud is that the false statement was made knowingly or with reckless indifference to the truth. *Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 333, 439 A.2d 534 (1982).

The Fourth Circuit has emphasized that summary judgment is seldom appropriate in cases in which particular states of mind are decisive as elements of a claim or defense. *Ballinger*, 815 F.2d at 1005 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979)). Cases which turn on a finding of intent are not ordinarily appropriate for disposition by way of a motion for summary judgment since resolution of such an issue depends on the credibility of the witnesses which can best be determined by the trier of fact after observation of the demeanor of the witnesses during direct and cross-examination. *Morrison v. Nissan, Ltd.*, 601 F.2d 139, 141 (4th Cir.1979).

Applying these principles here, this Court concludes that defendants' motion for summary judgment must be denied as to the issue of scienter.

(d)

*Reliance*

Defendants contend that summary judgment should be granted with respect to plaintiffs' Rule 10b–5 claims because plaintiffs are not entitled to a presumption of reliance and because plaintiffs have failed to produce evidence of actual reliance.

■ In a case involving "primarily a failure to disclose," plaintiffs are entitled to a presumption of reliance. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–154, 92 S.Ct. 1456, 1472–1473, 31 L.Ed.2d 741 (1972). This Court in *In re Jiffy Lube Sec. Litig.*, 772 F.Supp. 258, 267 (D.Md.1991) (Young, S.J.), noted that "[t]he categories of 'omission' and 'misrepresentation' are not mutually exclusive." (quoting *Little v. First California Co.*, 532 F.2d 1302, 1304 n. 4 (9th Cir.1976)). Judge Young went on to hold that in cases involving a mixture of omissions and misrepresentations, "the presumption of reliance is appropriate and the burden of rebuttal shifts to the defendants." 772 F.Supp. at 267.

■ It is not entirely clear whether or not Fourth Circuit law requires application of the *Affiliated Ute* presumption of reliance in a case involving both misrepresentations and omissions. *See Cox v. Collins*, 7 F.3d 394 (4th Cir.1993). In any event, it is not necessary to decide this issue at this time. It is apparent that plaintiffs' case rests primarily on Marriott's omissions, namely its alleged failure to disclose its consideration of the Transaction. Although plaintiffs have also alleged misrepresentations, these allegations relate to statements which plaintiffs contend were rendered misleading by the primary omissions. Included in the record are affidavits of individuals responsible for the investment decisions made by each of the plaintiffs. These affidavits raise genuine issues of material fact. The affidavits state that had these individuals known that Marriott was considering the Transaction, such knowledge would have affected their decision whether or not to purchase Marriott bonds at the prices at which they were purchased. These affidavits further create a genuine issue of material fact with respect to whether or not the PPM plaintiffs *actually* relied upon the alleged omissions.

Thus, whether or not plaintiffs are entitled to the *Affiliated Ute* presumption of reliance in this case, there are disputed questions of material fact which would not permit the Court to decide the issue of reliance by way of a motion for summary judgment. Accordingly, defendants' motion for summary judgment must be denied as to the issue of reliance which arises with respect to the plaintiffs' Rule 10b–5 claims.[5]

(e)

*Marriott as Statutory "Seller" Under § 12(2)*

Count II of the complaint alleges a violation of § 12(2) of the 1933 Act, 15 U.S.C. § 771. Defendants contend that all of the PPM plaintiffs' § 12(2) claims must fail because defendants were not statutory "sellers"

---

**5.** The plaintiffs also contend that they are entitled to the "fraud-on-the-market" presumption, adopted by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The plaintiffs may be entitled to such a presumption with respect to those bonds purchased on the open market. However, the state of the law is presently unclear with respect to whether or not the fraud-on-the-market presumption is applicable to initial public offerings. The Court need not, and does not, address this issue.

of the Marriott notes which were purchased by the plaintiffs. This Court would agree.

Section 12(2) provides in relevant part that:

Any person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they are made, not misleading ... shall be liable to the person purchasing such security from him [for specified damages].

During the course of this litigation, this Court has twice previously addressed the scope of liability under § 12(2). In its Memorandum and Order of April 22, 1993, the Court concluded that § 12(2) liability could arise from the sale and purchase of securities in the open market. 820 F.Supp. at 975–978. In that Memorandum and Order, the Court noted in a footnote that the phrase "shall be liable to the person purchasing such security from him" might limit the scope of liability under § 12(2). *Id.* at 978, n. 12. However, since the issue had been neither briefed nor argued by the parties at that early stage of the proceedings, the Court declined to then rule on the issue. *Id.*

Subsequently, defendants moved for partial dismissal of the complaint in *State Board of Administration of Florida v. Marriott Corp., et al.*, Civil No. H–93–876. In dismissing the claim of plaintiff State Board in its Memorandum and Order of October 18, 1993, this Court said the following (slip op. at 8–9):

This Court accordingly concludes that § 12(2) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." *Pinter,* 486 U.S. at 644, n. 21 [108 S.Ct. at 2077, n. 21.] However, the term "seller" is not limited merely to those who pass title. *Id.* at 643–644 [108 S.Ct. at 2076–2077]. Rather, a participant in the sale of a security is considered a statutory "seller" if they either directly pass title, or if they "solicit" the sale of the security. *E.g., Shapiro v. UJB Financial Corp.*, 964 F.2d

272, 287 (3rd Cir.), *cert. denied,* [— U.S. ——] 113 S.Ct. 365 [121 L.Ed.2d 278] (1992).

The Supreme Court in *Pinter* gave some indication of the scope of the term "solicit." In order to be considered a statutory "seller," a participant must engage in activity which could be considered an "offer" as this term is defined by § 2(3) of the 1933 Act. The term "offer" is defined as "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(3). If liability is based solely upon a participant's solicitation, the solicitation must be "motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter,* 486 U.S. at 647 [108 S.Ct. at 2078]. The prototype of a "solicitor" is a broker who solicits, in return for a commission, the purchase of a security on behalf of the owner of a security. *Id.* at 646 [108 S.Ct. at 2078]; *Wilson v. Saintine Exploration and Drilling Corp.,* 872 F.2d 1124, 1126 (2nd Cir.1989).

In its *State Board* ruling, this Court concluded that the complaint in that case failed to allege that the plaintiff had purchased Marriott notes "from" either the defendants or the underwriters of the initial public offering of the notes. *Id.* at 9. Relying upon *Pinter v. Dahl,* 486 U.S. 622, (1988), the Court reasoned that under the allegations of the *State Board* complaint, defendants neither directly passed title to the State Board, nor "solicited" the purchase by the State Board of Marriott notes. *Id.* at 8–9. Once again, the Court in its ruling decided that it was not necessary to address the issue of whether or not the defendants could be considered statutory "sellers" of the notes, even though the initial public offering of the notes was "firmly" underwritten. *Id.,* at 9, n. 5.

The statutory "seller" issue has now been fully briefed. After due consideration of the parties' arguments, the Court has concluded that defendants' motion for summary judgment must be granted as to plaintiffs' § 12(2) claims which are based upon notes purchased in the open market. It is apparent from the record here that the plaintiffs did not receive

title to these notes directly from Marriott, and that defendants did not "solicit" the sale of these notes.

■ Plaintiffs contend, in essence, that defendants "solicited" the plaintiffs' open market purchases of Marriott notes because defendants made public statements upon which the PPM plaintiffs relied in deciding whether or not to purchase Marriott notes in the open market. This interpretation of § 12(2) essentially equates "solicitation" with proximate causation of the purchase. Such a broad interpretation of the language at issue was specifically rejected by the Supreme Court in *Pinter.* 486 U.S. at 651–652, 108 S.Ct. at 2080–2081. Accordingly, the Court concludes that defendants' motion for summary judgment must be granted with respect to the claims of plaintiffs asserted under § 12(2) and based upon notes purchased in the open market.

■ The more difficult issue presented by defendants' pending motion for summary judgment is whether or not defendants could be considered statutory "sellers" of the Series L and M notes which were purchased by the plaintiffs at the initial public offerings. The parties do not dispute the fact that the initial public offerings of the Series L and M notes were firmly underwritten, with both title and risk of loss passing from Marriott to the underwriters.[6] It is thus apparent that plaintiffs did not receive title to these notes directly from Marriott. The plaintiffs nevertheless contend that they are entitled to sue under § 12(2) because defendants "solicited" the sale of these notes at the initial public offering.

At least two courts have indicated that an issuer of securities might be considered a statutory "seller" for purposes of § 12(2), even when the securities were issued through underwriters. The Court in *In re Keegan Management Co. Secs. Litig.*, Fed.Sec.L.Rep. (CCH) ¶ 96,275, 1991 WL 253003 (N.D.Cal. 1991) denied a motion to dismiss claims brought under § 12(2), concluding that plaintiffs in that case had adequately alleged the "seller" status of an issuing corporation.

Similarly, in *Abell v. Potomac Ins. Co.,* 858 F.2d 1104 (5th Cir.1988), the Court stated in *dicta* that "it *might* be said that everyone who invested in the initial offering bought from the underwriters and ... the issuer." *Id.* at 1114.

Defendants in turn rely on several cases in which courts have held that plaintiffs may not assert § 12(2) claims against the issuer of securities when the plaintiffs have purchased the securities from an underwriter rather than from the issuer. However, only one of these cases applied the principles of *Pinter,* and considered whether an issuer could be said to "solicit" the sale of securities by an underwriter. *Jackson v. First Federal Savings of Arkansas,* 709 F.Supp. 863 (E.D.Ark. 1988). The Court in *Jackson* concluded that the term "solicitation" as used in *Pinter* "does not extend to the putting of shares on the market in the hope that they will be purchased, nor of taking any of the other steps necessary to make a public offering." *Id.* at 884.

The Court in *Pinter* did not directly address the issue of the § 12(2) liability of an issuer in a firmly underwritten public offering. However, in considering the phrase "purchasing such security from him," the Supreme Court stated:

> One important consequence of this provision is that § 12(2) imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller.

486 U.S. at 644, n. 21, 108 S.Ct. at 2077, n. 21. In support of this proposition, the Supreme Court cited, *inter alia,* L. Loss, *Fundamentals of Securities Regulation* 1023–1024 (2d ed. 1988). At the pages cited, Loss states:

> [I]t seems quite clear that § 12 contemplates only an action by a buyer against *his immediate seller.* That is to say, in the case of the typical firm-commitment underwriting, the ultimate investor can re-

---

**6.** The underwriters of the Series L notes were Solomon Brothers and Donaldson, Lufkin & Jenrette Securities Corporation. The underwriters of the Series M notes were Solomon Brothers, Donaldson, Lufkin & Jenrette Securities Corporation, and Citicorp Securities Markets, Inc.

cover only from the dealer who sold to him. But the dealer in turn can recover over against the underwriter, and the latter (with some caveat by reason of the "preliminary negotiations" clause of § 2(3)) against the issuer, and each defendant can bring in his predecessor in the chain of distribution as a third-party defendant under the Federal Rules of Civil Procedure.

A number of considerations weigh heavily against the imposition of § 12(2) liability upon an issuing corporation in a firmly underwritten initial public offering. First, an issuing corporation typically has no direct contact with those who purchase its securities from an underwriter. Although the issuing corporation may make public statements concerning the public offering, these statements are usually not directed at any particular investor. The issuing corporation therefore does not engage in the type of one-to-one exchange of information which is typical of the broker-investor relationship and which the Supreme Court has viewed as the most typical example of "solicitation." *Pinter*, 486 U.S. at 646, 108 S.Ct. at 2078. To find "solicitation" in a case in which no attempt has been made by a defendant to channel information to the particular plaintiff would result in the broadening of the definition of a statutory "seller" to such an extent as to render meaningless the Supreme Court's statement that "a buyer cannot recover against his seller's seller." *Id.* at 644, n. 21, 108 S.Ct. at 2077, n. 21.

Second, as Professor Loss has pointed out, precluding the assertion by an ultimate investor of § 12(2) claims against an issuer does not necessarily insulate the issuer from liability under § 12(2). The ultimate investor may allege a claim under § 12(2) against the underwriter, which may in turn bring the issuer into the case as a third-party defendant pursuant to Rule 14(a), F.R.Civ.P. IX Loss & Seligman, at 4240.

Finally, the Court finds unpersuasive the essential argument advanced by plaintiffs in favor of allowing the assertion of claims under § 12(2) against an issuing corporation in a firmly underwritten initial offering. The Courts in both *In re Keegan* and *Abell* reasoned that the issuing corporation might "appear" to an investor to be the true "seller." Such a suggestion is based on an oversimplified view of the securities markets. Underwriting agreements are fully disclosed to the investment community,[7] and there is no reason to assume that investors (particularly sophisticated institutions like the plaintiffs) do not understand the nature of these agreements. Indeed, the whole body of federal securities law in based upon the underlying assumption that purchasers in securities markets *do* understand the information which is revealed to them. In this particular case, all of the plaintiffs are large institutional investors who clearly understood the nature and import of the underwriting agreements which were disclosed. These plaintiffs could hardly have believed that they were buying securities directly "from" Marriott in the sense that a consumer might believe that the car purchased from a dealer was in fact being bought "from" the manufacturer.[8]

In sum, this Court concludes that the better reasoned position is that the purchasers of securities at a firmly underwritten initial public offering may not assert claims under § 12(2) against the issuer of the securities.[9] This Court now so holds. Thus, the plaintiffs are not entitled to assert claims under § 12(2) against the defendants in this case. Accordingly, defendants' motion for summary judgment must be granted as to Count II of the complaint.

(f)

*Cognizable Damages*

■■■ After the complaint was filed in this case, each of the plaintiffs sold all of the

---

7. For example, in the present case, the existence and nature of the agreements between Marriott and the underwriters of the Series L and M notes were publicly disclosed in the Prospectus Supplements included in the Registration Statements filed by Marriott with the SEC in connection with the public offerings of these notes.

8. Such a comparison was relied upon by the Court in *Abell.* 858 F.2d at 1114, n. 8.

9. This Court does not agree with the suggestion in *Jackson* that the extension of § 12(2) liability to issuers would render superfluous § 11 of the 1933 Act and § 10(b) of the 1934 Act. *See* 709 F.Supp. at 884.

notes at issue. Of the 16 plaintiffs, 13 have sold their Marriott notes for a net profit (hereinafter the "13 profitable plaintiffs").[10] Defendants contend that these 13 profitable plaintiffs have suffered no damages cognizable under § 11 or § 12(2) of the 1933 Act.[11] The Court would agree.

Under § 11, a plaintiff may recover:

[S]uch damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.

Section 11(e), 15 U.S.C. § 77k(e).[12]

Under this statutory provision, if a plaintiff, after suit but before judgment, sells the securities at issue for a net profit, then the plaintiff has suffered no damages which are recoverable under § 11. The language of § 11(e) is unambiguous in this respect, and admits of no exceptions. *See Grossman v. Waste Management, Inc.*, 589 F.Supp. 395, 415–417 (N.D.Ill.1984) (dismissing § 11 claim where value of securities at the time suit was brought was greater than amount paid for the security); IX Loss & Seligman, at 4270.

Under Section 12(2), a plaintiff may recover:

[T]he consideration paid for such security with interest thereon, less the amount of

any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

Under this statutory provision, a plaintiff alleging a claim under § 12(2) is given a choice of remedies. The plaintiff may either (1) rescind the purchase of the securities at issue by tendering such securities to the defendant in exchange for the original purchase price of the securities, or (2) sell the securities and receive "damages." The Supreme Court has held that "a rescissory measure of damages" is employed to determine a plaintiff's damages under § 12(2). *Randall v. Loftsgaarden*, 478 U.S. 647, 656, 106 S.Ct. 3143, 3149, 92 L.Ed.2d 525 (1986). The Court in *Randall* held that, "the plaintiff is entitled to a return of the consideration paid, reduced by the amount realized when he sold the security and by any 'income received' on the security." *Id.* Thus, if a plaintiff sells the securities at issue for an amount greater than the plaintiff's purchase price, then the plaintiff has suffered no damages recoverable under § 12(2). IX Loss & Seligman, at 4242.

The 13 profitable plaintiffs essentially argue that these principles should not be applied to them in this case because they were "coerced" into selling their Marriott notes. Following this Court's approval of the settlement reached between the defendants and the class action plaintiffs in *United Apples Sales, Inc., et al. v. Marriott Corp., et al.*, H–92–2858 (Consolidated), the plaintiffs in this case were faced with essentially three choices: (1) to participate in the Exchange Offer, exchanging their "old" notes for "new" notes, and thereby waiving their right to continue this litigation; (2) to sell their "old" notes prior to the completion of the Exchange Offer, thereby capturing the temporary upturn in value of the "old" notes and retaining their right to continue this litiga-

---

**10.** The three plaintiffs which suffered a net *loss* on the sale of their holdings of the Marriott notes at issue are London Pacific, Provident Mutual, and Peoples Security. Thus, the following discussion of damages is not applicable to the claims asserted by these three plaintiffs.

**11.** As discussed hereinabove, the Court has concluded that plaintiffs may not assert claims under § 12(2) against defendants in this case. Nonetheless, the Court will address the issue of dam-

ages under § 12(2) as an alternative ground for concluding that the 13 profitable plaintiffs are not entitled to a recovery under § 12(2).

**12.** Under § 11(e), the amount of damages recoverable may be further reduced to the extent that the defendant proves that the depreciation in the value of the securities was not caused by the false statements or omissions of material fact contained in the registration statement.

tion; or (3) to hold on to their "old" notes and risk the further devaluation of these notes caused by a number of features of the settlement agreement.[13]

The 13 profitable plaintiffs argue that choices (1) and (3) were unacceptable and that therefore they had no choice but to choose option (2), namely, to sell their Marriott notes prior to the completion of the Exchange Offer. Conceding that under general principles they would not be entitled to recover damages under either § 11 or § 12(2), the 13 profitable plaintiffs contend that an exception to these principles exists in a situation in which a defendant's post-suit activities prevent a plaintiff from choosing the various remedies available under § 11 and § 12(2). They rely upon a single case, *Wigand v. Flo-Tek Inc.*, 609 F.2d 1028 (2d Cir.1979). The 13 profitable plaintiffs contend that under *Wigand* they should be allowed to recover damages equal to the difference between the purchase price of the notes and the price of the notes at the time suit was brought.

This contention is meritless. First, nothing in the language of either § 11 or § 12(2) indicates the existence of a "coercion" exception. Indeed, such an exception would create the absurd situation that a plaintiff who sold his securities for a profit could recover greater damages than a plaintiff who sold his securities for a loss. In the absence of specific statutory authorization, the plaintiffs are entitled to no such windfall.

Nor did *Wigand* create a "coercion" exception. In *Wigand,* the defendant, a closely-held corporation, "cancelled" the plaintiff's stock after the plaintiff had filed suit alleging a violation of § 12(2). The Court merely held that the act of "cancelling" the plaintiff's stock did not deprive plaintiff of the right to receive full rescissory damages. 609 F.2d at 1035. In *Wigand,* the plaintiffs had not, as have the plaintiffs here, sold the securities at issue for a profit.

Finally, even assuming that a "coercion" exception did exist, the 13 profitable plaintiffs were in no way "coerced" in this case into selling their Marriott notes. In approving the settlement of the class action claims in Civil No. H–92–2858 (Consolidated), the Court rejected the contention advanced at the time by the plaintiffs in this case that the settlement was coercive.[14] In its Memorandum Opinion of August 30, 1993, filed in Civil No. H–92–2858 (Consolidated), this Court stated:

> The objectors contend that the settlement is "coercive" because members of the Settlement Classes who either opt-out or who do not participate in the Exchange Offer will be worse off than if the settlement had simply not occurred. However, all proposed settlements are in a sense "coercive" in that those who choose not to participate may eventually be worse off than those who do participate. Members of the Purchaser Class must make their own individual decisions concerning whether to opt-out or whether to participate in the Exchange Offer. Those who choose to opt-out will have decided that the value of future litigation is higher that the value of the settlement. Those who do not opt-out and who participate in the Exchange Offer simply will have made financial calculations persuading them to participate in the settlement. The incentive to participate present in this and any other proposed settlement does not, however, constitute the type of "coercion" which would require this Court to find the proposed settlement to be inadequate.

*Id.* at 18.

Moreover, the plaintiffs could have retained possession of the "old" notes, and if a § 12(2) violation were proved, would be entitled to be fully compensated for any loss suffered as a result of any decrease in the value of the notes. Thus, the contention of the 13 profitable plaintiffs that they were

---

13. The settlement of the class action claims and the "Exchange Offer" were discussed in detail in the Court's Memorandum Opinion of June 22, 1993 and in its Memorandum Opinion of August 30, 1993. These opinions were filed in Civil No. H–92–2858 (Consolidated).

14. Counsel for plaintiffs appeared at the hearings held in Civil No. H–92–2858 on June 18, 1993 and August 6, 1993 and objected to both preliminary and final approval of the settlement.

"coerced" into selling the "old" notes is without merit.

Accordingly, for all of these reasons, the Court concludes that defendants' motion for summary judgment must be granted as to Count I and Count II of the complaint with respect to the 13 profitable plaintiffs.

### (g)
### Vanguard Opt–Out

█ Plaintiff Vanguard inadvertently submitted a proof of claim form in the class action settlement in Civil No. H–92–2868 (Consolidated). When it realized its mistake, Vanguard immediately contacted counsel for the class plaintiffs and withdrew its proof of claim. Plaintiff Vanguard has also expressly opted out of the settlement in a timely fashion and has never received any proceeds from the settlement. Vanguard's actions did nothing to hinder or delay the distribution of the proceeds of the settlement, and defendants took no action in reliance upon the submission by Vanguard of a proof of claim form.

Under these circumstances, this Court concludes that plaintiff Vanguard has validly opted out of the class action settlement and has preserved its right to participate as a plaintiff in this case. Defendants are not entitled to the dismissal of Vanguard as a plaintiff in this case.

### III

### Counterclaim Defendants' Motion for Summary Judgment

By way of this motion, the counterclaim defendants seek summary judgment in their favor as to counterclaim plaintiff Marriott's first amended counterclaim.[15] Only one claim is alleged in the counterclaim, namely that the counterclaim defendants tortiously interfered with Marriott's contractual relationships. For the reasons stated, the Court has concluded that counterclaim defendants' motion for summary judgment must be granted.

### (a)
### Background

Viewed in a light most favorable to counterclaim plaintiff Marriott, the record here evidences the following relevant background. Soon after the October 5, 1992 announcement of the Transaction, a group of institutional investors holding large amounts of Marriott notes held a series of conference calls. All of the counterclaim defendants participated in these conference calls either directly or through their respective investment managers. During these conference calls, the institutional investors discussed various strategies aimed at preventing Marriott from consummating the Transaction. Among the strategies discussed was the possibility of exerting economic pressure on Marriott's outside financial advisors in an attempt to force these advisors to withdraw from their participation in the Transaction.

Marriott had, inter alia, previously engaged two outside financial advisors, Merrill Lynch & Company (hereinafter "Merrill") and Houlihan Lokey Howard & Zukin, Inc. (hereinafter "Houlihan"). Merrill and Houlihan had been retained by Marriott during the summer of 1992 to act as advisors in connection with the Transaction. Merrill was retained primarily in order to render an opinion that the Transaction would be fair to Marriott's shareholders. Houlihan was retained primarily in order to render an opinion that both of the resulting entities, Host Marriott and Marriott International, would be solvent after the Transaction. The obtention by Marriott of a fairness opinion and a solvency opinion were necessary in order to comply with certain aspects of corporate law, as well as to give the Transaction credibility in the eyes of the securities markets.

Following the aforementioned series of conference calls held in mid-October of 1992, all of the counterclaim defendants, either individually or through their investment managers, contacted Merrill to express their displeasure with the Transaction. The counterclaim defendants, all of whom conducted business with Merrill, suggested that such

---

**15.** The 13 counterclaim defendants include all of the plaintiffs with the exception of Security Mutual, Security Equity and Utica National.

business would be withdrawn if Merrill continued to participate in the Transaction. Indeed, many of the counterclaim defendants, either individually or through their investment managers, did in fact stop doing business with Merrill, primarily by no longer executing securities trades through Merrill. The purpose of these actions was to persuade Merrill to withdraw from its participation in the Transaction.

One of the counterclaim defendants, PPM America, exerted similar pressure on Houlihan. PPM America served as a member of a number of bondholders' committees which were involved in bankruptcies and restructurings and which had employed Houlihan in connection with those matters. PPM America suggested to Houlihan that it would withdraw from these committees and would urge the committees to sever their relationships with Houlihan if Houlihan continued to participate in the Transaction. PPM America also informed Houlihan that in the future PPM America would no longer direct business to Houlihan if Houlihan continued to participate in the Transaction.

Due at least in part to the economic pressure exerted by the counterclaim defendants, both Merrill and Houlihan decided to withdraw from their participation in the Transaction. However, neither Merrill nor Houlihan in fact breached any contracts it had with Marriott. Rather, both Merrill and Houlihan reached "separation agreements" with Marriott, whereby Merrill and Houlihan were relieved of any further responsibilities in connection with the Transaction. Neither Merrill nor Houlihan rendered to Marriott its respective fairness opinion or solvency opinion, and Marriott was forced to retain other financial advisors to render these opinions. According to Marriott, it has suffered damages as a result of the actions taken by the counterclaim defendants.

In its first amended counterclaim, Marriott alleges that the actions taken by the counterclaim defendants constituted tortious interference with Marriott's contractual relationships. Both compensatory and punitive damages are sought.

(b)

*Discussion*

■ Maryland law is controlling as to the one claim asserted by defendant Marriott in its counterclaim. Under Maryland law, the elements of the tort of tortious interference with contractual or business relations are: (1) an intentional or wilful act; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants; and (4) actual damage or loss resulting to the plaintiff. *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 71, 485 A.2d 663 (1984); *Purity Products, Inc. v. Tropicana Products, Inc.,* 702 F.Supp. 564, 575 (D.Md.1988).

■ Marriott's counterclaim must fail for the simple reason that the allegedly wrongful actions of the counterclaim defendants amounted to no more than a decision to refuse to deal with Merrill and Houlihan, a decision which they had every right to make. This Court has held that, "under Maryland law, one who, regardless of motive, causes harm to another merely by refusing to continue a business relationship terminable at will is not liable for that harm" *Purity Products,* 702 F.Supp. at 575, n. 16 (citing *Cunningham v. A.S. Abell Co.*, 264 Md. 649, 658, 288 A.2d 157, *cert. denied,* 409 U.S. 865, 93 S.Ct. 160, 34 L.Ed.2d 114 (1972)). In opposing the pending motion for summary judgment, counterclaim plaintiff Marriott has in fact conceded that a mere "refusal to deal" cannot constitute tortious interference. Marriott attempts to avoid the necessary consequence of this concession by arguing, in essence, that in this case the "refusal to deal" was rendered unlawful by the counterclaim defendants' wrongful motive, namely, to induce a breach of contract.

The facts of record do not support this contention. Counterclaim defendants were not merely seeking to induce a breach of contract, but were rather attempting to protect their own economic interests by influencing those involved with the Transaction. *See* Restatement (Second) of Torts § 771. If applicable tort law were to prohibit the counterclaim defendants from acting as they did,

**880**

they would have been placed in an untenable position. Had they not acted, the counterclaim defendants would have been required to continue to do business with two entities, namely Merrill and Houlihan, which were actively engaged in a project with potentially adverse effects upon the counterclaim defendants.

Moreover, the actions of the counterclaim defendants were not otherwise unlawful. The types of actions which are generally considered unlawful for purposes of establishing a tortious interference claim are "violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *K & K Management, Inc. v. Lee,* 316 Md. 137, 166, 557 A.2d 965 (1989) (quoting W. Prosser, *Handbook of the Law of Torts* § 130, at 952–953 (4th ed. 1971)). No such unlawful acts were undertaken by the counterclaim defendants here. Nor did counterclaim defendants take any action, such as cutting off a supply of necessary materials, which necessarily prevented Merrill or Houlihan from performing their contracts with Marriott. *Compare, Sumwalt Ice & Coal Co. v. Knickerbocker Ice Co.,* 114 Md. 403, 80 A. 48 (1911), *discussed in, K & K Management,* 316 Md. at 160, 557 A.2d 965.

Under these circumstances, this Court concludes as a matter of law that the challenged actions of the counterclaim defendants were done with neither an "unlawful purpose" nor "without right or justifiable cause." Accordingly, counterclaim defendants' motion for summary judgment as to Marriott's counterclaim must be granted.

## IV

### *Conclusion*

For all of the reasons stated herein, defendants' motion for summary judgment must be granted in part and denied in part. Summary judgment will be granted in favor of defendants with respect to Count I of plaintiffs' first amended complaint as to the claims of plaintiffs PPM America, Transamerica Life, Transamerica Income, National Home, Commonwealth Life, Vanguard, Wellington Fund, Anchor Series, High Yield, New America, Security Mutual, Security Equity, and Utica National. Summary judgment will also be granted in favor of defendants with respect to Count II of plaintiffs' first amended complaint. In all other respects, defendants' motion for summary judgment will be denied. Counterclaim defendants' motion for summary judgment will be granted.

An appropriate Order will be entered by the Court.